UNITED STATES of America ex rel.
James ZISSLER, Plaintiffs,

v.

REGENTS OF THE UNIVERSITY
OF MINNESOTA, Defendant.

No. 3–95–168/RHK/FLN.

United States District Court,
D. Minnesota,
Third Division.

Jan. 8, 1998.

Marie–Therese Connolly, Carol Bennett, Helen Gaebler, and Mina Rhee, United States Department of Justice, Washington, DC, for plaintiffs.

Janice Symchych, Perry Wilson, William Dossett, & Julie Meany, Dorsey & Whitney, Minneapolis, MN, for defendant.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

In February 1995, Plaintiff James Zissler ("Zissler") filed suit against the Defendant the Regents of the University of Minnesota ("the University"), on behalf of the United States as a *qui tam* relator under the False Claims Act ("FCA"), 31 U.S.C. § 3731. In December 1996, Plaintiff the United States of America ("the government") intervened in the action. The government then filed suit against the University, alleging claims for violation of the FCA; unjust enrichment; payment by mistake; disgorgement of profits; and breach of fiduciary duties. The government's claims were on allegations that the University fraudulently submitted grant applications to the National Institute of Health ("NIH"); improperly sold unlicenced biological drugs resulting in illegal profits to the University; made fraudulent submissions for unlicenced and unreimbursable drugs to Medicare; and received illegal kickbacks related to home infusion services. On July 23, 1997, this Court granted the University's Motion to Dismiss the claims brought against it under the False Claims Act. Currently before the Court are the University's Motion for Partial Summary Judgment, based largely upon the statute of limitations, and its Motion to Dismiss the government's equitable claims. For the reasons set forth below, the Court will grant the Motion in part and deny it in part.

### Facts

**A. Nature of the Government's Allegations Against the University** [1]

1. *Misuse of Federal Grant Money*

Between 1969 and 1993, the University received approximately $19 million in NIH grant funds for a research project entitled "Studies of Organ Transplantation in Animals and Man" ("Transplant Grant"). (Compl. of United States ¶¶ 41–42.) A central component of the Transplant Grant was the study, development, and production of Antilymphocyte Globulin ("ALG"), a drug used to reduce organ transplant rejection reactions after surgery. (*Id.* ¶ 41.) The University made false statements to the NIH in connection with the Transplant Grant by representing that it earned no grant-related income, when, in fact, it earned over $80 million in program income from the sale of ALG. (*Id.* ¶¶ 44–45.) The University also falsely inflated salary, equipment, and other grant-related costs charged to the NIH and other federal agencies in connection with the "Program for Surgical Control of Hyperlipidemias" ("POSCH") Grant and twenty-

---

1. For purposes of the University's Motion for Partial Summary Judgment, the government's allegation regarding the University's underlying, illegal conduct are not relevant. Neither party has presented the Court with any evidence regarding the underlying conduct that forms the basis of the claims. The relevant facts are when the government knew of the alleged illegal conduct. The Court provides this initial factual information, taken from the government's Complaint, as context and background for the University's Motion.

For purposes of the University's Motion to Dismiss, the Court will assume the facts, as alleged in the Complaint, are true.

eight other federal grants. (*See id.* ¶¶ 76–85, 100–104.)

## 2. *Illegal Profits*

In January of 1971, the Food and Drug Administration ("FDA") designated ALG as an investigational new drug ("IND"). (Compl. of United States ¶ 11.) Even though it is illegal to sell investigational drugs for a profit, the University sold twenty different ALG products to approximately 280 different purchasers throughout the world and made $80 million on the sales. (*Id.* ¶¶ 45, 53–63.) The University concealed the illegal profits it earned from ALG sales from the federal government. (*Id.*)

## 3. *Medicare Reimbursement*

The University submitted false claims to the Medicare Program for payment relating to ALG, Procuren, and Perfusate. (Compl. of United States ¶ 86.) The University was not entitled to reimbursement for the expenses related to these drugs because the FDA had not approved them. (*Id.*) The government paid the University approximately $1.1 million for these improper Medicare claims. (*Id.* ¶ 87.)

## B. The Government's Knowledge of the University's Misconduct

### 1. *Knowledge of ALG Sales*

#### a. *The FDA*

After a 1984 inspection, the FDA learned that the University was selling ALG, and it asked University officials at the ALG program to explain why such sales should not be considered the improper commercialization of an IND. (Wilson Aff. Ex. B (Schafer report).) In 1987, after the University repeatedly failed to respond to this demand, the FDA ordered an investigation into the University's interstate shipment and sales of ALG. (*Id.*) Wayne Schafer ("Schafer"), an investigator for the FDA at its Minnesota branch office, conducted this investigation.

In his October 1987 report, Schafer indicated that the University had been selling ALG and that production of ALG had increased, "as well as the charges for the product, to the point where the 'program' is a large manufacturing operation with about 40 employees." (Wilson Aff. Ex. B at 1, 4–5, 7.) In 1986, the University shipped 29,001.87 grams of ALG at a cost of $215/gram, and in 1987, it shipped 23,532 grams, at a cost of $215/gram, for a combined total revenue of approximately $11,500,000. (*Id.* at 7; Wilson's 2nd Aff.Ex. A (Ex. C–1 to Schafer's report).) In addition, Schafer reported that the University was about to solicit bids for a new $8.5 million facility for the production of ALG. (Wilson's 2nd Aff.Ex A at 1.)

Officials at the ALG program told Schafer that "they do not make a profit on the products and at times have had considerable deficits. The products are reportedly being sold on a cost recovery basis." (Wilson Aff.Ex. B at 7.)

Schafer wrote an unusually long and detailed report so whoever reviewed it would have a good background on the ALG program and all that had transpired between it and the FDA. (Wilson Aff.Ex. at 46 (Schafer testimony).) Schafer "felt there were very serious problems [with the ALG program], and [he] wanted whoever the reviewer was to be very aware of the fact that I felt that there were problems." (*Id.*)

Schafer passed his report on to Michael Dubinsky ("Dubinsky"), the Director of Regulations and Bioresearch Monitoring, Office of Compliance, Center for Biologics Evaluation and Research of the FDA. (Dubinsky Aff. ¶ 1.) Dubinsky reviewed this report in late 1987 or January 1988. (Wilson Aff.Ex. C at 3 (Dubinsky test.).) After reviewing the report, Dubinsky felt that there "were some findings that were very troubling and indicated that there were some serious violations of the law that may have occurred...." (*Id.*)

The University repeatedly told the government that it was not earning any profits from the sale of ALG, when in fact it was earning large profits. In 1984, after receiving a report that ALG vials were leaking, Schafer met with James Coggins, Surgery Budget Office Administrator, who told Schafer that the University was shipping ALG drug products on a cost basis and that the Department of Surgery was not earning any profit on the sales. (Pl.'s Ex. 10 at 4 (1984 FDA Estab-

lishment Inspection Report).) In 1988, after the FDA had placed a charging hold on ALG which prohibited its sale for any amount, James Condie, ALG Program Director, falsely told the FDA that the University was not shipping ALG interstate for sale. (*Id.* at 21.) In 1989, FDA and University officials met to discuss the charging hold. At this meeting, Dr. John Najarian, the head of the Department of Surgery, told the FDA that all revenues that the ALG Program had collected over the years had been directed back into supporting the ALG Program and that all revenue had been spent. (*Id.* Ex. 17 at 12 (Dubinsky Test.) & Ex. 22 (Jan. 27, 1989 FDA meeting record from ALG Program).) At this time, the balance in the ALG Program's temporary investment pool ("TIP") was $17 million. (*Id.* Ex. 1 at 9 (University of Minnesota President's Public Investigative Report on MALG Program).) Finally, during a 1992 review of adverse reactions to ALG in patients, University officials told FDA inspectors that it had received no profits from the sale of ALG. (*Id.* at Ex. 27 at 17.)

In October and November 1992, the University disclosed documents to the FDA which showed that the University was profiting from the sale of ALG. (Holobaugh Decl. ¶¶ 4–6; Pl.'s Ex. 28 at 5–7, 14–15.) FDA inspectors had not seen these documents previously, even though many of them were dated before previous inspections had been conducted. (Holobaugh Decl. ¶¶ 5–6.)

#### b. *The NIH*

In 1977, the NIH issued a report on the ALG Transplant Grant, indicating that the University was engaged in large-scale production of ALG and that several hundred patients were involved in studies of ALG at several hospitals. (Wilson Aff.Ex. M at QTX022321–22, 26 (1977 NIH report).) The report noted that "the material will be provided free to participating centers and the University of Minnesota will attempt to work out some means of recovering costs." (*Id.* at QTX022327.)

The NIH was aware of the costs of producing ALG. The renewal application for the Transplant Grant, dated September 30, 1986, indicated that "the costs of OKT3 ($330/dosage) is approximately the same as MALG ($270/dosage)." (Wilson 2nd Aff.Ex. C at QTX011648.)

In its annual grant applications and renewals to the NIH, the University never reported that it had earned any money from its sales of ALG. "Between 1987 and 1992 . . . the MALG Program received gross revenues of approximately $29 million from the sales of [ALG]. . . . It does not appear that any of this MALG Program income was reported to the NIH." (Pl.'s Ex. 1 at 27 (Pres.' Public Investigative Report on MALG Program).) In addition, the University falsely certified that it had no program income for each year that it received the Transplant Grant.[2] (*Id.* at 5 (Reports and Expenditures and Financial Status Reports for the Transplant Grant from 1968 through 1995).) In October 1993, the University disclosed to NIH that it had received substantial program income from the Transplant Grant. (Garthune Decl. ¶ 3.)

#### 2. *Knowledge that the Transplant Grant had Supported the ALG Program*

The FDA was aware that NIH funding was being used to operate the ALG program. In a May 31, 1979 letter, Condie told the FDA that either additional NIH funding would be obtained to operate the ALG program, or it would be shut down. (Wilson Aff.Ex. B at 21 (Schafer Report).) Condie also stated that federal grants had supported the ALG program for the past eight years. (*Id.* Ex. K (May 31, 1979 letter from Condie to Samuel Gibson).)

In January 1988, Dubinsky spoke with James Wu, a case clerk at NIH, who assisted him in gathering information showing the sum of funds allocated to all Transplant Grant projects from 1968 to 1988 and sums related to ALG. (Wilson Aff.Ex. J (Dubinsky's handwritten notes).) Dubinsky noted that, in 1969, the "grant reviewer noted that

---

**2.** Under applicable NIH guidelines, program income is defined as "gross income earned by a recipient from activities part or all of the cost of which is either borne as a direct cost by a grant or counted as a direct cost towards meeting a cost sharing or matching requirement of a grant." 45 C.F.R. § 74.41.

large scale production of ALG will require funding which should be generated from sources other than this grant." (*Id.*)

### 3. United States' Knowledge of Medicare Charges for ALG

Schafer's 1987 report indicated that the University of Minnesota Hospital was billing Medicare for ALG that it had given to patients. (Wilson Aff.Ex. B at 7–8.) John Feldman ("Feldman"), head of the Minnesota Office of the FDA, informed the Inspector General about this practice. (*Id.* Ex. N (Jan. 10, 1989 phone record between Dubinsky and Feldman).) Exactly when Feldman told this to the Inspector General is unclear. The only evidence of this fact is a conversation record dated January 10, 1989 between Dubinsky and Feldman, indicating that Feldman told Dubinsky that "MIN–DO had recommended that the Inspector General's office (IG) look into the practice of Medicare making reimbursement for ALG since it was an 'investigational' product." (*Id.*)

### 4. Approval of ALG Sales

On April 25, 1989, the University requested that the FDA allow it to sell ALG on a cost recovery basis for $134 per gram. (Wilson Aff.Ex. O (Apr. 25, 1989 letter from Condie and Najarian to Parl Parkman).) The University included actual ALG expenses for 1988 and projected expenses for 1989 with its request. (*Id.*)

The FDA internally analyzed this request, concluding that the proposed selling price of $134 per gram "is not greater than the cost to recover manufacture, research, development and handling of the drug based on our financial analysis of their supply and distribution records of the last two years and their 1989 projections." (Wilson Aff.Ex. P (Johnson memo to Parkman).) In its analysis, the FDA concluded that the "approximate cost recovery price [for ALG was] $117.18 per gram." (*Id.*) The FDA approved the University's request to sell ALG at $134 per gram on May 1, 1989. (*Id.* Ex. Q (Parkman letter to Condie).)

### C. Applicable Regulations

Based upon ALG's status as an IND, it is subject to the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, and the Public Health Service Act ("PHSA"), 42 U.S.C. § 262. The PHSA prohibits the sale, barter, exchanges, or offer for sale of unlicensed biologics. 42 U.S.C. § 262. Sponsors and manufacturers of unlicensed biologicals that are studied under the IND process are precluded from "commercializ[ing] an investigational [new] drug by charging a price larger than that necessary to recover costs of manufacture, research, development, and handling of the investigational [new] drug." 21 U.S.C. § 355; 21 C.F.R. §§ 312.7(b) & (d), 312.7(d)(3).

In addition, as a recipient of NIH grant money, the University was subject to applicable NIH regulations. The NIH requires that officials at the applicant institution certify as true each grant application, progress report, and grant continuation application. (*See* Pl.'s Ex. 5 (report of research grant expenditures).) Each grantee institution is responsible and accountable for all funds, property and other assets acquired under the grant, and is responsible for assuring that they are used solely for authorized purposes. 45 C.F.R. § 74.21(b)(3). In addition, all program income that a grantee earns must be reported to the federal government and expended according to federal grant regulations. *See id.* § 74.21.

### Analysis

### I. Standard of Review–Motion for Summary Judgment

Federal Rule of Civil Procedure 56 states: [Summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In evaluating the movant's showing, the court should draw all justifiable inferences in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986); *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513; *see also Thomas v. Runyon,* 108 F.3d 957, 959 (8th Cir.1997). Where a moving party makes and supports a motion for summary judgment in accordance with Rule 56, a party opposing the motion may not rest upon the allegations or denials of its pleadings; rather, the adverse party's response must "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 256, 106 S.Ct. at 2514. *See also* Fed.R.Civ.P. 56(e).

## II. Statute of Limitations

The University argues that the six-year statute of limitations found in 28 U.S.C. § 2415(a) bars the government's claims for unjust enrichment, payment by mistake, equitable relief ancillary to the FCA, disgorgement, and breach of fiduciary duty. (Regents of the Univ. of Minn. Mem. in Supp. of Mot. to Dismiss and for Partial Summ. J. at 11–14.) ("Def.'s Mem.") The government disputes that any of these claims are barred by the applicable statute of limitations. (United States' Opp'n to Def.'s Mot. to Dismiss and for Partial Summ. J. at 14–22.) ("Pl.'s Mem.") It further contends that no statute of limitations applies to its claims for equitable relief ancillary to the FCA and disgorgement. (*Id.* at 29–32.) Thus, this Court must first decide which claims are governed by a statute of limitations.

### A. NIH Claims–Unjust Enrichment, Payment by Mistake, and Breach of Fiduciary Duty

In its claims for unjust enrichment, payment by mistake, and breach of fiduciary duty, the government seeks to recover NIH grant money that it paid to the University because the University failed to inform the NIH that it had received program income from its sale of ALG. (Compl.¶¶ 114–121, 131–135.) The University argues, and the government does not dispute, that 28 U.S.C. § 2415(a) applies to these claims. This statute states, in relevant part, that:

> Subject to the provision of section 2416 of this title, and except as otherwise provided by Congress, every action for money damages brought by the United States ... which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues.

28 U.S.C. § 2415(a). 28 U.S.C. § 2416 provides that the period during which "the facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances" shall be excluded "for the purpose of computing the limitations periods established in section 2415." *Id.* § 2416(c). The parties have also entered a series of tolling agreements which toll the statute of limitations and other time-based defenses, beginning January 26, 1994.

As a general principle, courts recognize that "under federal law governing statutes of limitations, a cause of action accrues when all events necessary to state a claim have occurred." *Chevron U.S.A. v. United States,* 923 F.2d 830, 834 (Fed.Cir. 1991). Neither party addresses the issue of when any of the government's claims against the University accrued. The Court believes that these causes of actions accrued on the date the University engaged in the improper conduct which gives rise to the claims—when it sold ALG for a profit, received program income from its sale of ALG, failed to report program income, and failed to report profits from the sale of ALG.

The statute of limitations, however, would have been tolled during the period when "the facts material to the right of action [were] not known and reasonably could

not [have been] known by an official of the United States charged with the responsibility to act in the circumstances." 28 U.S.C. § 2416(c). Thus, the issue becomes when the proper government official knew, or reasonably should have known, the facts material to these rights of action.

### 1. *Proper Government Official*

In order to determine if and for what period the statute of limitations was tolled, the Court must first determine who is the "government official charged with the responsibility to act in the circumstances." 28 U.S.C. § 2416(c). There is no Eighth Circuit case law interpreting this phrase. The legislative history for § 2416(c) indicates:

> This provision is required because of the difficulties of Government operations due to the size and complexity of the Government. It is not intended that the application of this exclusion will require the knowledge of the highest level of the Government. Responsibility in such matters may extend down into lower managerial levels within an agency. *As a general proposition, the responsible official would be the official who is also responsible for the activity out of which the action arose.* Such an official is the one likely to know whether the material fact does involve the possibility of a cause of action which may be asserted against the Government.

S.Rep. No. 1328 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2502, 2507 (emphasis added); *see also United States v. Stella Perez,* 956 F.Supp. 1046, 1052 (D.P.R.1997) (noting that under 28 U.S.C. § 2416(c), "it is crucial that facts be known to a government official who is charged with sufficient responsibility to take action under the circumstances"); *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.,* 777 F.Supp. 195, 205 (N.D.N.Y.1991) (noting that under 28 U.S.C. § 2416(c), when official who could take action recognizes the essential elements of the cause of action, the statute of limitations is not tolled), *aff'd* 985 F.2d 1148 (2nd Cir. 1993); *United States v. International Ass'n of Firefighters,* 716 F.Supp. 656, 659 (D.D.C. 1989) (noting that statute of limitations was tolled under 28 U.S.C. § 2416(c) because offi-

cial who could have demanded repayment of federal money did not know that money had been improperly paid to the defendants).

■ The government argues that the NIH official who needed to know about the University's program income from the sale of ALG is John Garthune ("Garthune"), who was the Assistant Director for Grants and Contracts of the Division of Extramural Activities and the Acting Chief Grants Management Officer at the National Institute of Diabetes and Digestive and Kidney Diseases (NIDDK) of the NIH during the applicable times. (Garthune Aff. ¶¶ 1–2.) As Acting Chief Grants Management Officer for NIDDK, Garthune had the authority to take action on issues involving grantee program income. (*Id.*)

The University does not dispute that Garthune fits the standard outlined in 28 U.S.C. § 2416(c), as an official at NIH "charged with the responsibility to act in the circumstances." (Def.'s Reply Mem. at 13.) The University also contends, however, that "Schafer and Dubinsky . . . all fit this standard." (*Id.*) The Court disagrees.

The University has failed to provide the Court with any evidence that either Schafer or Dubinsky are officials who are "charged with the responsibility to act in the circumstances," 28 U.S.C. § 2416(c), because they are "responsible for the activity out of which the action arose." S.Rep. No. 1328 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2502, 2507. In the instant case, the activities out of which the action arose are the NIH's award, renewal, and monitoring of the Transplant Grant and the University's failure to report program income it earned.

The record before the Court reveals that Schafer was an inspector with the FDA's district office in Minneapolis who had the authority to investigate the ALG program, but he had no power to order the University to cease selling ALG for a profit or to cease earning program income from the sale of ALG. The record further indicates that Dubinsky also did not have such authority; only the Director of the Office of Compliance at the FDA could issue a compliance letter to the University or issue a charging hold on the ALG program. (Dubinsky Aff. ¶ 5.)

Moreover, neither of these officials had any authority over NIH grants.

■ The University's contention that Schafer and Dubinsky are the officials whose knowledge could stop the tolling of the statute of limitations is flawed in another respect—it imputes the knowledge of the FDA to the NIH, and vice versa. The University contends that "the knowledge of the FDA officials is attributable to NIH officials because they are merely two branches of the same federal agency." (Def.'s Reply Mem. at 10.) The language of § 2416(c), however, does not support this proposition.

Section 2416(c) states that the statute of limitations is tolled until "an official of the United States charged with the responsibility to act in the circumstances" knows or reasonably should know of the facts material to the cause of action. 28 U.S.C. § 2416(c). Thus, § 2416(c) clearly dictates that an official *who has the authority to act* in the circumstances must know the relevant facts. *See United States v. Kass,* 740 F.2d 1493, 1497 (11th Cir.1984) (noting that § 2416(c) "recognizes, as a practical matter, that knowledge of a cause of action at one level of government is not always immediately communicated to the particular officials charged with acting upon it"). There is nothing in this language which indicates that the knowledge of an official at a different agency can be imputed to the official with authority to act at the agency directly responsible for the underlying conduct involved in the dispute.

As to these claims, the government alleges that the University lied to the NIH about the program income it earned from the sale of ALG, and that the University should be required to return grant money that the NIH improperly paid to it because of this. An official charged to act in these circumstances would be an official at the NIH who had

authority over the Transplant grant, not officials at the FDA who were investigating profits that the University was receiving from the sale of ALG.

■ Based upon the evidence that was presented in this Motion, the Court concludes that, with respect to the government's claims for unjust enrichment, payment by mistake, and breach of fiduciary duty, the statute of limitations was tolled until John Garthune knew, or reasonably should have known, the facts material to these causes of actions.

### 2. *Garthune's Knowledge of the Facts Material to These Causes of Action*

■ The six-year statute of limitations is tolled during the period during which Garthune either: (1) did not know the facts material to the right of action; or (2) reasonably could not have known of the facts material to the right of action. *Phillips Petroleum Co. v. Lujan,* 4 F.3d 858, 861 (10th Cir.1993); 28 U.S.C. § 2416(c). A fact " 'material to the right of action' necessarily includes the facts that gave rise to the right of action." *Id.* at 862. It is not necessary that Garthune "have all details of a claim before the statutory period begins to run; once the facts making up the 'very essence of the right of action' are reasonably knowable, the § 2416 bar is dropped." *United States v. Gavilan Joint Community College Dist.,* 849 F.2d 1246, 1250 (9th Cir.1988) (quoting *Kass,* 740 F.2d at 1497). The reasonableness requirement of § 2416(c) is a "complex factual determination to be made by the district court." *Phillips Petroleum,* 4 F.3d at 863.

■ The Court finds that genuine issues of material fact exist regarding whether Garthune knew, or reasonably should have known,[3] that the University had received un-

---

**3.** The Court notes that the University did not directly argue in its memoranda that the NIH *should have known* about the program income that the University earned from its sale of ALG. (*See* Def.'s Mem. at 11–13, 14 (arguing that the government's *actual knowledge* of the alleged infractions barred its claims for unjust enrichment, payment by mistake, and breach of fiduciary duty)); Def.'s Reply Mem. at 9–12 (arguing that the NIH *knew* of program income from the sale of ALG). In its Reply Memorandum, the Univer-

sity does argue that the government was on "inquiry notice" of the commercialization and sales of ALG. (Def.'s Reply Mem. at 6–9.) This notice, the University contends, is based upon the FDA inspections. (*Id.* at 6–7.) The Court has already determined, however, that the relevant inquiry is based on what Garthune at the NIH reasonably should have known about improper program income from the University's sale of ALG. The University has failed to show why the FDA's

reported program income from the Transplant Grant by January 26, 1988.[4] Garthune asserts that he did not know that the University had received program income from the Transplant Grant until 1993 and that he has no knowledge of any alleged discussions between John Wu, a case clerk at the NIH, and FDA officials regarding ALG sales that were supported by the Transplant Grant. (Garthune Aff. ¶¶ 3–4; Dubinsky Aff. ¶ 4 (stating that in 1988 he did not inform anyone at NIH that the University was selling ALG at a profit).)

The University argues that the NIH knew of wide-scale distribution of ALG and revenues from the sale of ALG because a 1977 NIH report indicated that, in a particular study, ALG "will be provided free to participating centers and the University of Minnesota will attempt to work out some means of recovering costs." (Def.'s Reply Mem. at 10–11 (citing Wilson Aff.Ex. M at QTX 022327).) The phrase "free to participating centers," the University contends, "clearly suggests that there may be charges in other contexts." (*Id.*) The Court finds this argument unpersuasive and contrary to how the Court must view the evidence in this Motion for Summary Judgment—in the light most favorable to the government.

The University also argues that the 1986 Transplant Grant application disclosed sales of ALG which would have created program income. (Def.'s Reply Mem. at 11–12.) This application, however, merely stated the cost of ALG as $270/dose, and did not indicate that the University was selling ALG. This evidence supports a reasonable inference that the government knew how much it cost to produce ALG, and not that the University was selling the drug. The University could know this figure because it kept track of how much money it spent on the ALG program and how much ALG it had produced, and not because it had sold the drug.

Based upon the evidence presented in this Motion, the Court concludes that a reasonable fact finder could conclude that Garthune did not know, and reasonably could not have known, about the program income the University had earned from the sale of ALG before January 26, 1988. The Court, therefore, will deny the Defendant's Motion with respect to the portion of the government's claims for unjust enrichment, payment by mistake, and breach of fiduciary duty that deal with recovering NIH grant money paid to the University.[5]

**B. Disgorgement**

The government alleges that the University used federal grant money to illegally sell ALG for profit, in violation of the PHSA and the FDCA, and it seeks to divest the profits that the University earned in direct contravention of these laws. (Compl. ¶¶ 122–130 .) The government has brought two claims requesting the divestment of profits from the University—a claim for equitable relief ancillary to the FCA (Count VI)[6] and a claim for disgorgement of illegal profits (Count VII).

knowledge of sales of ALG should have put either Garthune or anyone at the NIH on notice of these sales and the program income earned from them.

4. This date is six years before the date upon which the parties agreed that the statute of limitations was tolled.

5. A portion of the government's claim for unjust enrichment and payment by mistake involve the University's improper billing of Medicare for the cost of ALG. (Compl.¶¶ 29–30, 86–89, 114–121.) The University references such Medicare payments and the government's alleged knowledge of them in the factual portion of its memorandum (Def.'s Mem. at 8–9), but it never mentions them in the argument section of its memorandum. (*See id.* at 11–14.) The University, however, specifically refers to the government's knowl-

edge of "the alleged infractions and misconduct regarding ALG sales and the relation of the Transplant Grant funds to the ALG program," and argues that this knowledge bars the government's claims for unjust enrichment and payment by mistake. (*Id.* at 11–12.). The Court concludes that the University did not raise the issue of whether the government's claims for unjust enrichment and payment by mistake based upon the University's billing of Medicare for ALG are barred by statute of limitations in the instant Motion, and it will not address these claims in this Memorandum Opinion and Order.

6. The University argues that the government's claim for equitable relief ancillary to the FCA should be dismissed based upon this Court's July 23, 1997 Memorandum Opinion and Order which found that the government could not assert FCA claims against the University. (Def.'s

### 1. Applicable Statute of Limitations

The University argues that the government's claim for disgorgement (Count VII) is not an independent cause of action, but merely a remedy that the government could possibly assert under its claims for unjust enrichment and breach of fiduciary duty. (Def.'s Mem. at 13–14.) As such, the University contends that it "is based on the existence of a contract implied in law," and is barred by the six-year statute of limitations in 28 U.S.C. § 2415(a). (Id.)

The Court finds that the government's reliance upon the statute of limitations in 28 U.S.C. § 2415(a) is misplaced. Section 2415(a) states, in part, that:

> Subject to the provision of section 2416 of this title, and except as otherwise provided by Congress, every action for *money damages brought by the United States* ... which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues.

28 U.S.C. § 2415(a) (emphasis added).

 Disgorgement of illegal profits, however, is an equitable remedy, not a request for money damages. *See United States v. Incorporated Village of Island Park*, 791 F.Supp. 354, 370 (E.D.N.Y.1992) (finding that 28 U.S.C. § 2415(a) did not apply to government's claim for imposition of a constructive trust and disgorgement of profits that the defendant earned through its misuse of federal money because disgorge-ment is not an action for money damages, but for equitable relief); *see also S.E.C. v. Rind*, 991 F.2d 1486, 1490 (9th Cir.1993) (holding that SEC enforcement action seeking disgorgement of securities profits was equitable in nature, and not an action for money damages). Even if this Court were to construe the government's request for disgorgement as a remedy for its claims for unjust enrichment and breach of fiduciary duty, those claims would not be claims for money damages, but for equitable relief. By the statute's plain meaning, § 2415(a) does not apply to the government's claim for disgorgement of illegal profits.[7]

 It is a well established rule that "an action on behalf of the United States in its governmental capacity ... is subject to no time limitation, in the absence of congressional enactment clearly imposing it." *E.I. Dupont De Nemours & Co. v. Davis*, 264 U.S. 456, 462, 44 S.Ct. 364, 366, 68 L.Ed. 788 (1924); *see also Guaranty Trust Co. v. United States*, 304 U.S. 126, 132, 58 S.Ct. 785, 82 L.Ed. 1224 (1938); *United States v. Wurdemann*, 663 F.2d 50, 51 (8th Cir.1981). In the instant case, the University has not identified a statute of limitations that applies to the government's request for disgorgement of illegal profits, whether it be a remedy for its other claims or a separate cause of action, and therefore, the Court concludes that no statute of limitations applies to it.

 The University also contends that the government's claim for disgorgement is

---

Mem. at 12.) In that Opinion, the Court noted that "because [it] had determined that the False Claims Act does not apply to the University, the False Claims Act cannot be a basis upon which this Court could grant such equitable relief." (Doc. No. 66 at 13 n. 9.) The Court agrees that this claim should be dismissed. The government has failed to offer any explanation as to why it should be allowed to assert a claim which is dependent upon a cause of action that cannot be brought against the University. The Court, therefore, will grant the University's Motion with respect to Count VI.

7. Even if this Court believed that § 2415(a) applied to the government's claim for disgorgement of illegal profits, it would not grant the University's Motion with respect to this claim. The University claims that Schafer knew that the University was selling ALG for profit in 1987 and that Dubinsky learned this when he reviewed Schafer's report in late 1987 or early 1988. Based upon its previous discussion, however, the Court questions whether Schafer's or Dubinsky's knowledge would have stopped the tolling of the statute of limitations under 28 U.S.C. § 2416(c). Neither are "official[s] of the United States charged with the responsibility to act in the circumstances." The record before the Court shows that neither of these men had the authority to order the University to stop selling ALG for a profit or to prevent the sales altogether. Moreover, the Court believes that the University has produced evidence that the FDA knew the University was *selling* ALG, not that it was *selling it for a profit*. The issue of whether the official at the FDA charged with the responsibility to act should have known about the profits from the evidence of sales is a complex factual dispute that would not be properly resolved in a motion for summary judgment.

barred by the "concurrent remedy rule." (Def.'s Mem. at 13; Def.'s Reply Mem. at 14.) Under the "concurrent remedy rule," courts have found that "equity will withhold its relief in such a case where the applicable statute of limitations would bar the concurrent legal remedy." *Cope v. Anderson*, 331 U.S. 461, 464, 67 S.Ct. 1340, 1341, 91 L.Ed. 1602 (1947). The University contends that it has shown that the statute of limitations bars the government's legal claims, and that the disgorgement claim is also barred by this same statute of limitations. (Def.'s Reply Mem. at 14.)

■ The Court finds that the "concurrent remedy rule" does not bar the government's claim for disgorgement. The Court has already rejected the University's argument that the statute of limitations bars the government's claims for unjust enrichment and breach of fiduciary duty. Because the applicable statute of limitations does not bar the concurrent legal remedy, it would not bar the equitable remedy.

■ This Court also questions whether the "concurrent remedy rule" should apply to the government's disgorgement claim. In *United States v. Banks*, 115 F.3d 916 (11th Cir.), *petition for cert. filed* 66 U.S.L.W. 3297 (1997), the Eleventh Circuit held that the "concurrent remedy rule cannot properly be invoked against the government when it seeks equitable relief in its official enforcement capacity." *Id.* at 919; *see also Federal Election Comm'n v. Christian Coalition*, 965 F.Supp. 66, 71 (D.D.C.1997) (questioning whether *Cope v. Anderson* and the "concurrent remedy rule" should be applied to the government because *Cope* did not involve a limitation on an action brought by the United States). The *Banks* court refused to apply the "concurrent remedy rule" to the government's request for injunctive relief under the Clean Water Act because to do so would be to ignore

> the well-established rule that an action on behalf of the United States in its governmental capacity . . . is subject to no time limitation, in the absence of congressional enactment clearly imposing it, [and] the canon of statutory construction that any statute of limitations sought to be applied against the United States must receive a strict construction in favor of the Government.

*Banks*, 115 F.3d at 919 (citations omitted). This Court is persuaded by *Banks* and finds that the "concurrent remedy rule" should not apply to the government's disgorgement claim because the government is seeking equitable relief in its enforcement capacity. The Court, therefore, will deny the University's Motion with respect to its argument that the statute of limitations bars the government's disgorgement claim (Count VII).

#### 2. *Laches*

The University argues that laches should bar the government's claim for disgorgement of ALG profits. (Def.'s Mem. at 14.)

■ The doctrine of laches "is an equitable defense to be applied when one party is 'guilty of unreasonable and inexcusable delay that has resulted in prejudice' to the other party." *Bostwick Irrigation Dist. v. United States*, 900 F.2d 1285, 1291 (8th Cir. 1990) (quoting *Goodman v. McDonnell Douglas Corp.*, 606 F.2d 800, 804 (8th Cir. 1979)). The Eighth Circuit has clearly held that, "whatever the application of [laches] to private parties, we have recognized the long-standing rule that laches does not apply in an action brought by the United States." *Id.*

■ In an attempt to circumvent this rule, the University argues that the government's claim for disgorgement is brought on behalf of private individuals, and it asks this Court to apply an exception to the rule that courts have created for cases in which the EEOC brings a claim that asserts the rights of individual claimants. (Def.'s Mem. at 14.) The University, however, neither attempts to identify the alleged private individuals on whose behalf the government is bringing this claim nor explain from where their rights originate. (*See id.*) The Court believes that the government is seeking to vindicate public rights when it attempts to disgorge illegal profits that the University allegedly earned from selling ALG in violation of the FDCA. In doing so, the government is acting as the steward of a program intended to protect the public health. The potential harm to the

public in consuming drugs which have not been approved or certified in accordance with the law is self-evident. The University has failed to show that laches could apply to the government's claim for disgorgement.

The University also contends that this Court, as part of its inherent power of a court sitting in equity, can dismiss stale claims. (Def.'s Reply Mem. at 15.) The disgorgement claim, the University argues, is "beyond stale" because the FDA knew of the sales of ALG for over twenty years before the disgorgement claim was commenced. (*Id.*)

■■■■■ Courts sitting in equity have the power to dismiss stale claims, even when no statute of limitations would apply. *See Occidental Life Ins. Co. v. E.E.O.C.*, 432 U.S. 355, 373, 97 S.Ct. 2447, 2458, 53 L.Ed.2d 402 (1977) (noting that although no statute of limitations applied to E.E.O.C. enforcement action, courts have the discretion to bar relief in light of government's unexcused delay in bringing claim that prejudices the defendant); *Rind*, 991 F.2d at 1492 (noting that although no statute of limitations applied to S.E.C.'s enforcement claim, "a court may exercise its discretion to limit the Commission's power to seek relief"). The Court refuses to do so in the instant case. As the Court has previously noted, there is no direct evidence that the FDA knew of the profits the University was earning from its sale of ALG, while there is ample evidence that the University actively concealed such profits from the government for years.

Moreover, the Court questions the prejudice that the University has allegedly suffered from this delay. The University claims that it is prejudiced because the government "allow[ed] the University's claimed liability to grow for two decades without ever informing University administration." (Def.'s Reply Mem. at 15.) Medical school officials, however, knew that their conduct violated the law, and they consciously chose to engage in it. (Holobaugh Aff.Ex. 32 at 5–6 (University ALG report endorsing cost recovery for ALG, even though it was understood that "cost recovery in any form is strictly illegal but it is my opinion that when it is done on behalf of the University, the FDA probably will not take action").) The University, as the institution that received the NIH grant money, certified to the government that it would adequately monitor and oversee the Transplant Grant, and the University—and not the medical school or the department of surgery—was legally responsible for the award. *See* 21 C.F.R. §§ 312.50, 312.53; 42 C.F.R. § 52.2(e). This Court does not accept the University's assertion that it was solely the government's delay in filing suit that allowed the sale of ALG to continue. The University was responsible for the administration and oversight of the Transplant Grant; its action or inaction in adequately monitoring this program, therefore, caused the prejudice of which it complains. Accordingly, the Court will deny the University's Motion with respect to its claim that laches or the delay of the government in filing suit should bar its disgorgement claim.

### III. Approval of Sale of ALG

The University contends that the government cannot seek disgorgement of profits from ALG sales because the FDA approved the sale of ALG on a cost recovery basis for $134 per gram on May 1, 1989. (Def.'s Mem. at 15.) It argues that it should be allowed to rely on the FDA's affirmative approval of the $134 sales price, even if the true price to produce ALG is less than $134 per gram. (*Id.*)

■■■■■ The Court concludes that the University's position is not supported by the law. It is well established that government officials cannot act outside the scope of their authority. *See Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 383, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *United States v. Hall*, 588 F.2d 1214, 1215 n. 2 (8th Cir.1978). In *Merrill*, the Supreme Court stated:

> Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly

exercised through the rule-making power. And this is so even though ... the agent himself may have been unaware of the limitations upon his authority.

332 U.S. at 383, 68 S.Ct. at 3. The FDA had no authority to approve the sale of ALG for a profit. *See* 21 U.S.C. § 355; 21 C.F.R. § 312.7(d)(3). Thus, the fact that it approved the sale of ALG at $134 per gram in May 1989, even though the FDA estimated the cost to be only $117 per gram, "would not be binding on the government," and cannot preclude it from seeking to disgorge illegal profits the University earned after this date. *See United States v. E. W. Savage & Son,* 475 F.2d 305, 308 (8th Cir.1973).

 The University also argues that the FDA's approval of the sale of ALG on a cost recovery basis constitutes a waiver of the government's disgorgement claim. (Def.'s Mem. at 16.) Waiver is the "intentional relinquishment of a known right." *F.D.I.C. v. Hartford Accident and Indem. Co.,* 97 F.3d 1148, 1151 n. 3 (8th Cir.1996). A party's intent is a question of fact. *See First Nat'l Bank v. Allen,* 118 F.3d 1289, 1294 (8th Cir.1997). The Court concludes that genuine issues of material fact exist regarding whether the government intended to waive its right to seek recovery of ALG profits, and the Court will deny the University's Motion to preclude recovery of disgorgement of ALG profits earned after May 1989.

## IV. Standard of Review—Motion to Dismiss

 A motion to dismiss should be granted "as a practical matter ... only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." *Frey v. City of Herculaneum,* 44 F.3d 667, 671 (8th Cir.1995) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)). Dismissal is "inappropriate unless it appears beyond a doubt that the [non-moving party]

can prove no set of facts in support of his claim that would entitle him to relief." *Hafley v. Lohman,* 90 F.3d 264, 266 (8th Cir. 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1081, 137 L.Ed.2d 216 (1997). When reviewing a motion to dismiss under Rule 12(b)(6), the Court presumes all factual allegations to be true and construes all reasonable inferences from them in favor of the non-moving party. *Id.*

## V. Availability of Equitable Remedies

The University contends that this Court cannot award the equitable remedy of disgorgement of ALG profits because the government has an adequate remedy at law.[8] (Def.'s Mem. at 17.) The University fails to identify the government's adequate remedy at law, although it implies that the government's claims for unjust enrichment, payment by mistake, and breach of fiduciary duty are the adequate remedies at law. (*See* Def.'s Mem. at 17 (noting that if the government had acted timely, "it had an adequate remedy at law for any alleged grant fraud, mismanagement, or misuse").)

 It is well established that a party is entitled to equitable relief only if there is no adequate remedy at law. *See Lewis v. Cocks,* 90 U.S. (23 Wall.) 466, 470, 23 L.Ed. 70 (1874); *Birch v. Mazander,* 678 F.2d 754, 756 (8th Cir.1982). The mere existence of a possible remedy at law, however, is not sufficient to warrant denial of equitable relief. *Interstate Cigar Co. v. United States,* 928 F.2d 221, 223 (7th Cir.1991). "The jurisdiction in equity attaches unless the legal remedy, both in respect to the final relief and the mode of obtaining it, is as efficient as the remedy which equity would afford under the same circumstances." *Id.* (quoting *Gormley v. Clark,* 134 U.S. 338, 349, 10 S.Ct. 554, 557, 33 L.Ed. 909 (1890)); *see also Mitsubishi Int'l v. Cardinal Textile Sales,* 14 F.3d 1507, 1519 (11th Cir.1994) (noting that "if the legal remedy by action and pecuniary judgment for debt or damages would be complete, suf-

8. Along with citations to three cases, the University's contention that "this Court cannot award an equitable remedy because the United States has an adequate remedy at law" is the extent of the University argument on this issue. (*See* Def.'s Mem. at 17.) The University neither identifies what the adequate remedy at law is nor attempts to explain why the unnamed legal remedy is adequate.

ficient, and certain—that is, would do full justice to the litigant parties—in the particular case, the concurrent jurisdiction of equity does not extend to such a case") (quoting 1 John Pomery, *Equity Jurisprudence* § 178 (1918), *cert. denied* 513 U.S. 1146, 115 S.Ct. 1092, 130 L.Ed.2d 1061 (1995)).

■ The Court finds that the University has failed to show that the legal remedies available to the government are adequate, thus precluding equitable relief. In the instant case, the government is seeking monetary damages to recover the NIH grant payments it made to the University based upon the University's fraudulent statements that it was not earning profits or program income from the sale of ALG. The Court does not believe, however, that the recovery of these damages would "do full justice to the litigant parties." *Mitsubishi,* 14 F.3d at 1519. Courts frequently allow equitable remedies, such as constructive trusts or disgorgement of profits, where one party has wrongfully or fraudulently obtained money and then used it to obtain a greater profit. *See id.* at 1518–19 (discussing the law of constructive trusts); *see also Restatement of Restitution* § 202 (citing cases). In such cases, the plaintiff is not fully compensated by merely recovering the money that was wrongfully taken from her; she is also allowed to recover the profits that the defendant earned from the funds. Because the University has failed to offer any explanation as to why the legal remedies available to the government are adequate, the Court will deny its Motion to dismiss equitable claims based upon the adequacy of the government's legal remedies.[9]

## VI. Government's Injury from ALG Sales

The University contends that the government cannot recover the University's alleged profits from the sale of ALG because the government was not a party to any of the illegal sales and because it has not suffered any injury from these sales. (Def.'s Mem. at 18.) The Court disagrees.

■ The University has not cited to any authority holding that the government must suffer injury to recover illegal profits from a wrongdoer. In other contexts, the government is allowed to bring civil enforcement actions and disgorge illegally obtained profits even though it has not suffered any injury. *See SEC v. Rind,* 991 F.2d 1486, 1490 (9th Cir.1993) (noting that the government can bring a civil enforcement action for violation of federal securities law and obtain disgorgement of profits even when no injured investors can be identified). The Court also notes that the government, as protector of the public interest, has suffered an injury through the alleged illegal sales of ALG—the public interest and safety has been compromised through the University's sale of drugs that the government has not properly approved. The Court, therefore, will deny the University's Motion with respect to its claim that the government lacks the proper injury to request disgorgement.

## VII. The Government's Unclean Hands

■ The law of equity requires that

he who comes into equity must come with clean hands. This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief....

*Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.* ., 324 U.S. 806, 814, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945); *see also Hanson & Assocs. v. Farmers Co-*

---

**9.** The University also claims that the government is not entitled to disgorgement of ALG profits because these profits were caused by the work and invention of the University. (Def.'s Mem. at 17–18.) Courts have prevented a plaintiff, in the securities fraud context, from disgorging "any portion of the profits attributable to the defendant's special or unique efforts ... other than those for which he is duly compensated." *Pidcock v. Sunnyland America, Inc.,* 854 F.2d 443,

447 (11th Cir.1988) (quoting *Siebel v. Scott,* 725 F.2d 995, 1002 (5th Cir.1984)); *see also Janigan v. Taylor,* 344 F.2d 781, 787 (1st Cir.1965). The Court believes that this argument addresses the amount of disgorgement to which the government would be entitled, and not whether it can seek any amount of disgorgement. Resolution of this issue involves complicated factual disputes, thus precluding a dismissal of the government's request for disgorgement of ALG profits.

*op. Creamery Co.*, 403 F.2d 65, 70 (8th Cir. 1968).

 Courts in equity have a wide range to use their discretion to refuse aid to an unclean litigant. *Precision Instrument*, 324 U.S. at 814, 65 S.Ct. at 997. In determining whether a party's misconduct prevents it from seeking equitable relief from the court, that party's misconduct

> must not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character. Any wilful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim by the chancellor.

*Id.*, 324 U.S. at 815, 65 S.Ct. at 997; *see also Hanson* 403 F.2d at 70 (noting that a party can be denied equitable relief where his or her conduct "has been unconscionable by reason of bad motive, or where the result induced by his conduct will be unconscionable either in the benefit to himself or the injury to others").

The University contends that the government has unclean hands and should be barred from seeking equitable relief. The government has unclean hands, the University argues, because it knew for over twenty years that the University was selling ALG and it approved the sale of ALG in 1989 for $134 per gram.

 The Court does not believe that the government has unclean hands which would bar it from seeking disgorgement of the profits the University earned from the sale of ALG. The government is seeking disgorgement of *profits,* not the *proceeds* the University earned from its sale of ALG. Thus, the Court does not believe that the government's knowledge of sales, and its failure to file suit against the University, despite this knowledge, constitutes a "wilful act concerning the cause of action which rightfully can be said to transgress equitable standards." *Precision Instrument,* 324 U.S. at 815, 65 S.Ct. at 997. In its broad discretion, the Court will not preclude the government from seeking equitable relief because of its unclean hands, and it will deny the University's Motion on this ground.

**Conclusion**

Based on the foregoing, and upon all the files, records, and proceedings herein, **IT IS ORDERED** that the University's Motion to Dismiss and for Partial Summary Judgment (Doc. No. 97) is **GRANTED** with respect to the government's claim for Equitable Relief Ancillary to the False Claims Act (Count VI), and is **DENIED** in all other respects.