**UNITED STATES of America ex rel. Brett ROBY, Plaintiff,**

v.

**The BOEING COMPANY, Defendant.**

No. C–1–95–375.

United States District Court,
S.D. Ohio,
Western Division.

March 24, 2000.

James Burdette Helmer, Jr., Helmer Martins & Morgan—2, Fourth & Walnut Centre, Cincinnati, OH, David Phillip Wilson, Michael A Havard, Provost & Umphrey, Beaumont, TX, Charles V Firth, Reuben A Guttman, Daniel J Guttman, Provost & Umphrey, Washington, DC, James Edward Wimberley, McPherson Monk Hughes Bradley & Wimberley, Nederland, TX, for Brett Roby.

Michael S Child, U.S. Department Of Justice, Washington, DC, for U.S.

Jerome Charles Randolph, Keating Muething & Klekamp—1, Cincinnati, OH, Curtrice M White, Todd W Rosencrans, Steve Y Koh, Steven S Bell, Mark H Lough, Gary DiBiance, Perkins Coie, Seattle, WA, Mitchell S Ettinger, Bonnie J Austin, Martin T Moe, Edward J Meehan, Raina E Burbaker, Jennifer L Spaziano, Gary DiBianco, Skadden Arps Slate Meagher & Flom, Caprice L Roberts, Skadden Arps Slate Meagher & Flom LLP, Washington, DC, for Boeing Company.

Jerome Charles Randolph, Keating Muething & Klekamp–1, Cincinnati, OH, for Speco Corporation.

## ORDER

SPIEGEL, Senior District Judge.

This matter is before the Court on Defendant's Motion for Summary Judgment (doc. 456); the Government's and Relator's Response (doc. 484); Defendant's Reply (doc. 491); the Government's and Relator's Motion for Partial Summary Judgment in Regards to the Liability of Helicopters

Sold with Defective Gears (doc. 457); Defendant's Response (doc. 481); the Government's and Relator's Reply (doc. 495); the Government's and Relator's Motion for Partial Summary Judgment as to Defendant's Third Affirmative Defense in Regards to the High–Value Items Clause and Insurance Coverage (doc. 458); Defendant's Response (doc. 482); the Government's and Relator's Reply (doc. 493); the Government's and Relator's Motion for Partial Summary Judgment in Regards to Defendant's Fourth, Eighth, and Twelfth Affirmative Defenses (doc. 459); Defendant's Response (doc. 483); and the Government's and Relator's Reply (doc. 492).

In addition, the Parties have also filed the following supplements or amendments to their original motions for summary judgment: (1) the Government's and Relator's Brief of Supplemental Authority in Regards to its Motion for Summary Judgment (doc. 514); (2) the Government's and Relator's Addenda/Amended Exhibits/Indexes/Amendments to their Joint Motions for Partial Summary Judgment (docs. 462, 476, 498, 513 & 514); and (3) Defendant's Motion to file a sur-reply to the Government's and Relator's Reply Brief (doc. 509).

Furthermore, this Court held a hearing in this matter on August 12, 1999 (doc. 521).

## BACKGROUND

On May 22, 1995, *qui tam* relator,[1] Brett Roby (hereinafter, "Relator"), filed this action under seal pursuant to Title 31 U.S.C. § 3730(b) on behalf of himself and the United States Government (hereinafter,

"the Government" or "the United States") in the United States District Court for the Southern District of Ohio (doc. 2). Relator alleges that The Boeing Company (hereinafter, "Boeing" or "Defendant") and its supplier, The Speco Corporation (hereinafter, "Speco"),[2] violated the False Claims Act, Title 31 U.S.C. § 3729, *et seq.*, by manufacturing and selling defective transmission gears to the United States via Boeing's CH–47(D) Chinook Army helicopters[3] (hereinafter, "CH–47(D) helicopters") (*Id.*). Speco manufactured the allegedly defective gears at its Springfield, Ohio facility before the gears were then installed by Boeing into the CH–47(D) helicopters. Those helicopters were then provided to the Government by Boeing (*Id.*).

On April 30, 1997, the Government intervened and filed an Amended Complaint against Boeing (doc. 34). The Amended Complaint was unsealed on May 1, 1997. In the Amended Complaint, the Government alleges that Speco manufactured defective, transmission gears at its Springfield, Ohio facility before Boeing installed the gears into the CH–47(D) helicopters, and, thereafter, supplied the defective gears and helicopters to the United States Army (*Id.*).

According to the allegations contained in the Amended Complaint, in 1985, Defendant contracted with the Government to "re-manufacture" or "re-convert" its medium-lift helicopter fleet, consisting of appropriately 400 helicopters, into what is now known as the CH–47(D) helicopter (doc. 34). Over a period of time, Defendant

---

1. The term *"qui tam"* is short for *"qui tam pro domino rege guam pro se imposo sequitur,"* which is interpreted as "he who brings the action as well for the king as for himself." *Bass Anglers Sportsman's Soc'y of America v. U.S. Plywood–Champion Papers, Inc.,* 324 F.Supp. 302, 305 (S.D.Tex.1971).

2. Although the Speco Corporation was initially a party to this action as the original maker and supplier of the gears in question to Boeing, Speco later filed for bankruptcy during

the course of the present litigation. The trustee appointed by the United States Bankruptcy Court subsequently settled this action with the Government and Relator, with the approval of the Bankruptcy Court, on behalf of Speco and its creditors.

3. The CH–47(D) Chinook helicopter is the Army's medium, tactical, heavy-lift, and transport helicopter, and is normally operated and crewed by a total of four soldiers (doc. 34).

entered into two multi-year contracts for the modification or conversion of the Army's Chinook helicopter fleet, at a total project cost of approximately $2 billion dollars (*Id.*). Among the modifications made during the re-manufacturing of the helicopters were the use of Defendant's proprietary steel alloy, BMS 7–223, known as "Vasco," which was to be used as the engine and combining transmission gears for the modified helicopters (*Id.*).

The Government and Relator allege in Count I of the Amended Complaint that Defendant submitted false claims in violation of the False Claims Amendments Act as prescribed under Title 31 U.S.C. §§ 3729–3133, as amended by Pub.L. 99–562, 100 Stat. 3153 (1986) (doc. 34). Specifically, the Government contends that in 1991, one of the Speco-made gears failed in flight, while in service in Saudi Arabia, leading to the total loss of a CH–47(D) helicopter and all of its contents at an estimated loss of approximately $10 Million (*Id.*).[4] In addition, the Government alleges that in 1993, another Speco-made gear failed in another helicopter incident resulting in a hard landing near Ft. Meade, Maryland,[5] causing approximately $1 million in damage to that helicopter (*Id.*).[6]

Relator alleges that at a total cost to the United States of about two billion dollars ($2,100,000,000), Boeing re-manufactured the Army's fleet of Chinook CH–47 A/B/C model helicopters into Chinook CH–47(D) and MH47D/E helicopters, and the contracted work to those helicopters was performed in an "incompetent and dangerous manner" by Defendant (*see* docs. 34 & 367). Moreover, Relator asserts that each of these "unsuitably, re-manufactured helicopters" were delivered by Boeing to the Government by operation of a claim for payment in the form of a "Standard Form DD250" that falsely represented that the contracted helicopters conformed to all of the specified contract requirements (*Id.*). Relator avers that it has evidence that Defendant acted in a reckless manner by installing the defective gears without adequate inspection (*Id.*). For example, Relator alleges that, Boeing for at least ten years prior to the Saudi crash had prior knowledge that the transmission helicopter gears were prone to certain grinding cracks and breakage (*Id.*). Relator further alleges that the material from which the gears were made are especially susceptible to exactly the kind and type of burning and cracking that resulted in the crash of Aircraft 89–0165 (*Id.*).

Moreover, the Government and Relator aver in the Amended Complaint that, "[b]y virtue of the acts described above, Boeing, by and through its officers, agents, and employees, knowingly submitted, and caused to be submitted, false or fraudulent claims for payment or approval to [its] officers, employees, or agents of the United States Government" (doc. 34). The

---

**4.** Specifically, Relator asserts that "Aircraft 89–0165" (a CH–47(D) helicopter) was shipped by the Army, after delivery from Boeing, to the Persian Gulf for use in Operation Desert Shield/Desert Storm (*see* docs. 34 & 367). Relator alleges that on January 11, 1991, during its 56th hour of operation, the defective transmission gear exploded, causing Aircraft 89–0165 to crash and catch fire (*Id.*). The resulting fire consumed the entire helicopter, a HMWWW truck, ammunition, and various essential equipment, including a howitzer and its tow vehicle (*Id.*). Relator contends that the United States Army replaced Aircraft 89–0165 by buying a new CH–47(D) fully-equipped helicopter at a replacement cost of more than $12.7 million (*Id.*).

**5.** Relator submits that approximately eighteen months after the Saudi crash, and a year after Boeing re-inspected the Speco-made gears, another transmission gear also broke due to a grinding crack and proximately caused the second helicopter incident at Ft. Meade, Md. (*see* docs. 34 & 367). Relator alleges that about half-a-dozen more Speco-made gears were pulled from service or inventory as a result of the 1993 Ft. Meade incident (*Id.*).

**6.** Although there were reported injuries and the loss of military equipment associated with the helicopter incidents in question, there were no reported fatalities in either the Saudi crash or the Ft. Meade hard landing (*see* docs. 34 & 367).

Government concludes Count I with the contention that "[b]y reason of these payments made upon these false claims, the United States Government has been damaged as a result of Defendant's violations of the False Claims Act (hereinafter, the "FCA" or the "Act"), arising under 31 U.S.C. §§ 3729(a)(1), (2), (3) & (7), for damages to be determined at trial" (*Id.*).

The Amended Complaint further asserts claims against Defendant for: (1) payment by mistake; (2) unjust enrichment; (3) breach of contract; and (4) common law fraud (Id.). The Government seeks to recover treble damages based on the value of the first CH–47(D) helicopter and its contents, for the cost of repairing the second aircraft, and to treble those damages under the False Claims Act of 1986 (*Id.*).[7] In addition, the Government asserts that it is entitled to treble damages for the delivery of other U.S. Army Chinook helicopters with allegedly non-conforming engine transmission gears that were manufactured by Speco from 1987 to 1995,[8] and statutory penalties of $5,0000 to $10,000 for the submission of each purportedly false claim for the helicopters in question (*Id.*).

In its Answer, Defendant submits a general denial of the Government's allegations of false claims, violations of the False Claims Act, and the resulting compensatory and statutory damages (doc. 161). Specifically, Defendant counters the allegations contained in the Amended Complaint by asserting a total of twelve (12) affirmative defenses that would individually or collectively relieve Defendant of all liability from the Government's claims (*Id.*).[9] For example, Defendant's Third Affirmative Defense originally stated that, the "damages sought by the [G]overnment are barred by its inclusion of the High Value Items Clause in the prime contract with Boeing" (*Id.*).[10] Furthermore, Defendant's Fifth Affirmative Defense originally stated that, the "United States cannot recover damages under the False Claims Act for the two helicopters, or their contents, which the [G]overnment alleges were lost or damaged as a consequence of defective parts...." due to the fact that consequential damages are not recoverable under the FCA (doc. 340). Defendant asserts that, the False Claims Act precludes recovery for product defects, consequential damages[11], or any other recovery not found in

---

7. Relator also asserts that Boeing paid Speco $4,874 for the cost of the defective gear involved in the Saudi crash, which Relator estimates to be less than one percent of the Government's actual loss (*see* doc. 367).

8. The Government contends that while the cost of the re-manufactured helicopter involved in the Saudi crash was estimated at about $4 million, the cost for its replacement was well over $12 million (doc. 34).

9. Boeing alleges the following Affirmative Defenses to the allegations set forth in the Amended Complaint: (1) the failure to state a claim upon which relief can be granted; (2) the fraud cause of action is time-barred; (3) the damages sought are barred by the High–Value Items Clause; (4) the application of the doctrine of estoppel due to the High–Value Items Clause; (5) the recovery of consequential damages are not available; (6) no injury in-fact; (7) the failure to plead fraud with particularity; (8) the application of laches; (9) an express contract is in force; (10) the special damages are not plead with specificity; (11) punitive damages are not plead with

particularity; and (12) the application of equitable estoppel (doc. 161).

10. " 'High-value item' means a contract end item that (a) has a high unit cost (normally exceeding $100,000 per unit), such as an aircraft, an aircraft engine, a communications system, a computer system, a missile, or a ship, and (b) is designated by the contracting officer as a high-value item." 48 C.F.R. § 46.802 (West 1999).

11. Defendant argues that the Government's alleged replacement cost of over $12 million for the Saudi helicopter is considered to be consequential damages under the False Claims Act (*see* docs. 161 & 340). Therefore, even if Defendant is found liable for submitting a false claim for the defective gears to the Government, Defendant avers that, it would be at most liable to the Government for the cost of the gears, and not the consequential damages that allegedly follows the submission of the false claim (*Id.*).

the statute itself (*Id.*).[12]

The Court will now address the Parties' cross-motions for summary judgment in the order of their filing (*see* docs. 456, 457, 458 & 459) and we will make our determination as to the appropriateness of each motion in Sections I–IV of the Discussion.

## STANDARD OF REVIEW

The narrow question that we must decide on a motion for summary judgment is whether there exists a "genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Supreme Court elaborated upon the appropriate standard in deciding a motion for summary judgment as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. *Id.* at 321, 106 S.Ct. 2548; *Guarino v. Brookfield Township Trustees,* 980 F.2d 399, 405 (6th Cir. 1992); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989). If the

moving party meets this burden, then the non-moving party "must set forth specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Guarino,* 980 F.2d at 405.

As the Supreme Court stated in *Celotex,* the non-moving party must "designate" specific facts showing there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Guarino,* 980 F.2d at 405. Although the burden might not require the non-moving party to "designate" facts by citing page numbers, " 'the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies.' " *Guarino,* 980 F.2d at 405 (quoting *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990)).

Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Conclusory allegations, however, are not sufficient to defeat a motion for summary judgment. *McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1162 (6th Cir.1990).

## DISCUSSION

### I. *Defendant's Motion for Summary Judgment (doc. 456).*[13]

On June 15, 1999, Defendant filed its Motion for Summary Judgment (doc. 456)

---

**12.** In its Answer (doc. 161), Defendant asserted as its Fifth Affirmative Defense that, "Plaintiffs' claim for consequential damages is not available under the False Claims Act." The Court held in its December 30, 1999 Order that, consequential damages were not recoverable under the False Claims Act, but that direct damages were recoverable under the Act (doc. 579). *See U.S. ex rel. Roby v. Boeing Co.,* 79 F.Supp.2d 877, 893 (S.D.Ohio 1999). Therefore, Defendant's Fifth Affirmative Defense can be asserted as a bar against Plaintiffs' recovery of "consequential" damages in relation to a claim that was asserted under the FCA, but would not act as a bar to

the recovery of direct damages under the FCA (*see* doc. 579).

**13.** The Court would like to take this opportunity to note that, the Parties to this action have submitted extremely detailed, lengthy, and argumentative motions for this Court's consideration. For example, Defendant's Motion for Summary Judgment is 123 pages in length (excluding attachments); Plaintiffs Response is 88 pages in length (excluding attachments); and Defendant's reply is 100 pages in length (excluding attachments). In this Order, the Court will attempt to summarize the Parties arguments whenever possible

and moves this Court for summary judgment against all of the claims that were asserted in the Amended Complaint (*see* doc. 34). For the reasons more fully stated in the following subsections, Defendant asserts that judgment should be entered in Defendant's favor on Count One, arising under the False Claims Act, 31 U.S.C. §§ 3729–3732. Defendant further asserts that, the Government and Relator (hereinafter, "Plaintiffs") have failed to put forth sufficient evidence that Defendant acted with the requisite intent or that the claims in question was false. In particular, Defendant alleges the following reasons as to why there are no genuine issue of material fact in relation to Count One:

(1) There is no evidence that Defendant actually knew or recklessly disregarded information showing that any defective gear was installed in any helicopter delivered to the Army;

(2) There is no evidence that any gear currently in the Army's inventory is defective or unsafe; and

(3) The record establishes that Defendant's oversight of the subcontractor, Speco, was not, as a matter of law, reckless.

(doc. 456). Defendant also contends that, it is entitled to summary judgment as to the four remaining counts of the Amended Complaint, all of which sound in common law.[14]

### A. *Count One: The False Claims Act*

The FCA imposes liability on any person who "knowingly presents" to the government a "false or fraudulent claim for pay-

ment or approval," or who "knowingly makes ... a false record or statement" in order to have "a false or fraudulent claim paid or approved by the [g]overnment." 31 U.S.C. §§ 3729(a)(1)-(2) (West 1999). A person "knowingly" submits a false claim if, with respect to information in the claim, the person: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information and no proof of specific intent to defraud is required. *See* 31 U.S.C. §§ 3729(b)(1)-(3) (West 1999).

■ Specifically, to sustain a claim under the FCA, Plaintiffs must prove each of the following elements by a preponderance of the evidence: (1) that Defendant made a claim, or made a statement in order to get the Government to pay money on a claim; (2) that the claim or statement was false or fraudulent; and (3) that Defendant knew that the claim or statement was false or fraudulent. *See* 31 U.S.C. § 3729(a)(2) (West 1999); *see also United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir.1999).[15]

■ At a minimum, the FCA requires proof of an objective falsehood. *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1477–78 (9th Cir.1996). Expressions of opinion, scientific judgments, or statements as to conclusions about which reasonable minds may differ cannot be false. *See Wang ex rel. United States v. FMC Corp.*, 975 F.2d 1412, 1420–21 (9th Cir. 1992) ("Bad math is no fraud, proof of

for the sake of brevity, while at the same time giving due consideration to *all* of the Parties pleadings, motions, supplements, attachments, and arguments during our deliberations.

**14.** Plaintiffs assert in their Amended Complaint that Defendants are liable for: (1) violations of the FCA; (2) the Government's payment by mistake; (3) unjust enrichment; (4) breach of contract; and (5) common-law fraud (doc. 34).

**15.** The district court in the case of *U.S. ex rel. Lamers v. City of Green Bay*, 998 F.Supp. 971 (E.D.Wis.1998), explained the purpose of the FCA in relation to the elements of intent and falsity:

The inseparability of the falsity element and the scienter element is consistent with the whole purpose behind the FCA, which is to combat fraud on the government and not to scrutinize a statement for factual inaccuracies.

*Id.* at 986.

mistake is not evidence that one is a cheat, and the common failings of engineers and other scientists are not culpable under the Act."); *see also Tyger Constr. Co. v. United States,* 28 Fed. Cl. 35, 57 (1993) (noting that FCA liability will not attach for a statement relating to a contract term that is incapable of a precise definition, and fraud cannot be predicated on the mere expression of an opinion); *Boisjoly v. Morton Thiokol, Inc.,* 706 F.Supp. 795, 808 (D.Utah 1988) (finding that the FCA requires a statement of fact that can be said to be either true or false). Similarly, the Seventh Circuit held that:

> errors based simply on faulty calculations or flawed reasoning are not false under the FCA. And imprecise statements or differences in interpretation growing out of a disputed legal question are similarly not false under the FCA.

*Lamers,* 168 F.3d at 1018 (citations omitted).

 An untrue statement, however, is not sufficient by itself to warrant liability under the FCA, the Act also "requires a showing of knowing fraud." *Hagood,* 81 F.3d at 1478. What is prohibited is "cheating" the government. *See Wang,* 975 F.2d at 1420; *see also McNally v. United States,* 483 U.S. 350, 358, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). Thus, "statements of claims which are false within the meaning of the FCA must be more than objectively untrue, they must betray or suggest intentional deceit." *Lamers,* 998 F.Supp. at 986–71.

 Courts therefore consistently recognize that "[i]nnocent mistakes or negligence are not actionable under" the FCA. *Hindo v. Univ. of Health Sciences/The Chicago Med. Sch.,* 65 F.3d 608, 613 (7th Cir.1995); *see also Hagood,* 929 F.2d at

1420. Nor does the mere presence of a defect create liability under the Act. *United States ex rel. Anderson v. Northern Telecom, Inc.,* 52 F.3d 810, 816–17 (9th Cir.1995); *see also Wang,* 975 F.2d at 1421 ("The Act is concerned about ferreting out wrongdoing, not scientific errors. What is false as a matter of science is not, by that very fact, wrong as a matter of morals."); *Hindo,* 65 F.3d at 613 ("In short, the claim must be a lie.").[15]

Based on these principles, several federal courts have recognized that summary judgment is properly granted to a defendant in a FCA case when a plaintiff fails to adduce enough evidence from which a reasonable jury could find that the claim at issue was objectively false, or that the defendant acted with the requisite intent. *See, e.g., Lamers,* 168 F.3d at 1019–20; *Hagood,* 81 F.3d at 1477–78; *Northern Telecom,* 52 F.3d at 815–16; *Wang,* 975 F.2d at 1420–21; *Luckey v. Baxter Healthcare Corp.,* 2 F.Supp.2d 1034, 1049 (N.D.Ill.1998); *United States ex rel. Windsor v. DynCorp., Inc.,* 895 F.Supp. 844, 850 (E.D.Va.1995); *United States ex rel. Butler v. Hughes Helicopters, Inc.,* 71 F.3d 321, 329 (9th Cir.1995) (affirming a directed verdict for defendant where the evidence presented by the plaintiff could not support a finding of the requisite knowledge under the FCA).

### 1. *Defendant's Position*

Defendant initially asserts that, it is entitled to summary judgment on Count One because the Government cannot show that Defendant knowingly submitted any false claim in violation of the FCA. *See Hagood,* 81 F.3d at 1478 ("The False Claims Act . . . requires a showing of knowing fraud."); *see also Northern Telecom,* 52 F.3d at 816–17 (finding that liability does

---

15. However, the knowing submission of a non-conforming product is but one type of a false claim. *See, e.g., United States v. Bornstein,* 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976) (falsely marked goods); *Daff v. United States,* 78 F.3d 1566 (Fed.Cir.1996) (improper manufacturing and testing proce-

dures); *United States v. Ben Grunstein & Sons Co.,* 127 F.Supp. 907 (D.N.J.1955) (use of inferior products and the bypassing of inspection requirements); *United States v. Collyer Insulated Wire Co.,* 94 F.Supp. 493 (D.R.I. 1950) (failure to properly test).

not arise under the Act for the mere delivery of defective products, absent evidence that the defendant knew that the product was defective). Defendant also asserts that, in order to survive a motion for summary judgment on the FCA claim, Plaintiffs must be able to point to sufficient evidence in the record in order to show that: (1) Defendant submitted an objectively false claim to the Government for payment; and (2) Defendant's [non-specific] personnel actually knew that the claim was false, or acted in reckless disregard or deliberate ignorance of the truth or falsity of the claim. *See* 31 U.S.C. § 3729(a)(2); *see also Lamers*, 168 F.3d at 1018. Defendants sets forth a number of legal theories in order to show that the Government cannot meet its burden as to Count One (*see* doc. 456).

First, Defendant contends that, the record is devoid of evidence that Defendant ever had "actual knowledge" that the gears in question were defective before they were installed in the aircraft that were subsequently delivered to the Government. Moreover, Defendant avers that, there is no evidence that, before the 1991 incident in Saudi Arabia, any of Defendant's [non-specific] personnel knew or had reason to know that certain individuals at Speco were negligent in executing the inspections of the gears in question. Indeed, Defendant maintains that the evidence is to the contrary. For instance, Defendant alleges that, Speco previously had been successful in identifying anomalies in the dampening ring grooves through inspection before the gears were delivered to Defendant in the past. Accordingly, Defendant contends that, it had no reason to believe that Speco's inspection techniques were ineffective at the time in question.

Second, Defendant submits that, any FCA claim based on the 1993 Ft. Meade incident that is associated with the failure of a Speco-made gear must also fail because there is no evidence that Defendant had any reason to know that a defect existed at the time the helicopter was delivered. According to Defendant, the undisputed facts show that, one of the contributing causes of the 1993 incident was a unique anomaly created when a Speco employee attempted to remove a sharp edge from the gear's surface during production of the gear. Defendant argues that, the Speco employee failed to make the required notation that he had performed this extra procedure, and, thus, Defendant had no reason to question whether the postprocedure inspections had actually occurred. Defendant asserts that, the anomaly was not discovered during the scheduled 1991 re-inspection because it was not located in any dampening ring groove—the location of the gear that the Army had designated for re-inspection in 1991.

Third, Defendant submits that, the allegations about the 1991 and 1993 re-inspections cannot support a FCA claim. Defendant contends that, the Government's alleged FCA claims are nothing more than a claim of negligence which is not cognizable under the FCA. *See Hindo*, 65 F.3d at 613 ("Innocent mistakes are not actionable under this section."). Moreover, Defendant alleges the fact that the Army was fully aware of and participated in both the planning and execution of the re-inspection precludes, as a matter of law, any findings that Defendant acted with wrongful intent under the FCA. *See Hughes Helicopters*, 71 F.3d at 326–27 ("That a defendant has disclosed all of the underlying facts to the government may . . . show that the defendant had no intent to deceive.") Furthermore, Defendant alleges that, there are no witnesses or documents that supports Plaintiffs' unsubstantiated theory that Defendant chose not to perform "nital etch" [16] inspections in order

---

16. "Nital etch techniques" detect the presence of grinding burns and areas of decarburization (doc. 456). This is accomplished by submersing a gear in an acid etch and then examining it for the presence of deviations in colorization, which indicate the presence of these conditions (*Id.*).

somehow to deceive or cheat the Army. Rather defendant maintains that the decision not to conduct such inspections was a scientific judgment that is not actionable under the FCA. *See Northern Telecom,* 52 F.3d at 815–16; *see also Hagood,* 81 F.3d at 1477–78 ("The statutory phrase 'known to be false' does not mean 'scientifically untrue,' it means a lie."); *Hughes Helicopters,* 71 F.3d at 327; *Baxter Healthcare,* 2 F.Supp.2d at 1047.

Fourth, Plaintiffs, Defendant submits, have no evidence that any gear currently in service is unsafe or defective in any way. Moreover, the only evidence that Plaintiffs are prepared to proffer is that the Speco-made gears are allegedly unsafe. According to Defendant, this amounts to nothing more than mere speculation that some gears could have a potential defect. Defendant asserts that, the mere speculations of Plaintiffs are patently insufficient to meet their burden of defense on a motion for summary judgment.

Fifth, Defendant also alleges that, it was not reckless in continuing to procure Speco-made gears through 1995, since Defendant did not act with a wrongful intent and the Government is unable to prove the existence of an actual defect due to a lack of quality. *See United States ex rel. Compton v. Midwest Specialties, Inc.,* 142 F.3d 296, 302 (6th Cir.1998). Indeed, Defendant further alleges that, the Government, during the same time frame, contracted with Speco for the purchase of the same or similar aerospace parts at the same time it had many government-qualified assurance personnel in place to monitor the Speco-made parts throughout the period of the ten years at issue. *See Hughes Helicopters,* 71 F.3d at 362–27 ("The evidence established that all information upon which [relator] bases his case

was not only available to the Army, but was in the Army's possession"); *see also Lamers,* 998 F.Supp. at 988; *X Corp. v. Doe,* 816 F.Supp. 1086, 1094 n. 12 (E.D.Va. 1993).[17]

Next, Defendant denies Plaintiffs' allegations that Defendant's supervision of Speco and its personnel was reckless under FCA law. Rather, the record, Defendant argues, overwhelmingly establishes that Defendant's oversight of Speco was unrelenting and conscientious in regards to Speco's processes and procedures. Moreover, Defendant alleges that, among the many quality controls regularly employed by Defendant were the destructive testing of gears, the annual and special quality audits, the coordination committee meetings to address any production issues, and the use of rejection reports to document any parts with potential anomalies that were discovered during the manufacturing process.

Seventh, Defendant maintains that, the Amended Complaint accuses it of failing "to conduct a thorough re-inspection of the suspect Speco gears in both its 1991 and 1993 inspections" (*see* docs. 34 & 456). Defendant alleges that, this is not a cognizable theory of liability under the FCA because it is simply an allegation of negligence, and not one of recklessness of the truth or falsity of the information. *See* 31 U.S.C. §§ 3729(a)(1)-(2); *see also Wang,* 975 F.2d at 1420. Accordingly, Defendant argues that, the real issue to decide on its Motion is whether Defendant submitted a claim that was knowingly false in regard to the re-inspections, and not whether Defendant was "thorough" in how it conducted the re-inspections. Since there were no knowingly false statements made to the Government concerning the re-inspections,

---

17. The district court in *X Corp.* stated in dicta: The fact that a contractor fully disclosed all of the information to the government may show that the contractor has not "knowingly" submitted a false claim, that is, that it did not act with "deliberate ignorance" or with a "reckless disregard of the truth."

*Id.,* 816 F.Supp. at 1094 n. 12 (citing *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.,* 985 F.2d 1148, 1157 (2d Cir. 1993)).

Defendant defends that this claim must therefore fail. Moreover, Defendant contends the fact that the planned scope of the re-inspections and its parameters were made with the full knowledge and approval of the Army, precludes the requisite intent required by the FCA. *See Lamers,* 998 F.Supp. at 988 (finding that "no violation exists where the government has not been deceived"); *see also Hughes Helicopters,* 71 F.3d at 326 (finding that a continuing dialogue and "pattern of cooperation between the Army and [the contractor]" was sufficient evidence showing that the contractor lacked the requisite intent under the FCA).

Lastly, Defendant points out that the Amended Complaint alleges that, Defendant knowingly delivered gears to the Army that contained "rejectable CICN,"[18] and that Defendant failed to inform the Government of this fact (*see* doc. 1). Defendant asserts that, this allegation fails in the first instance because Plaintiffs have not and cannot identify any gears that had "rejectable CICN" that were actually installed in helicopters.

Defendant concludes its arguments as to Count One by stating that:

> there is simply no testimony, empirical data, or any other evidence to prove that any gear in service is defective or unsafe. All that the DOJ offers in order to support its claim that the gears are unsafe is a hypothesis that potential defects might possibly exist in some unspecified gear. This kind of metaphysical doubt is insufficient to create a factual dispute on summary judgment, or to meet the [G]overnment's burden under the FCA.

(doc. 456); *see also Wang,* 975 F.2d at 1420–21.

## 2. *Plaintiffs' Position*

In its Response filed July 6, 1999 (doc. 484), Plaintiffs initially begin their arguments by flatly denying all of Defendant's assertions that are set forth above, and further summarizes that Defendant is not entitled to summary judgment because genuine issues of material fact exist. In addition, Plaintiffs assert in the alternative that, they are the party that is rightfully entitled to summary judgment based on their motions that have already been submitted for this Court's review. Plaintiffs also set forth several legal theories countering as to why Defendant's Motion for Summary Judgment should not be granted (*see* doc. 484).

First, Plaintiffs allege that, Defendant misinterprets the definition of "knowingly" under the FCA. Specifically, Plaintiffs assert that, under the FCA, "no specific intent to defraud is required", and, therefore, Defendant is plain wrong when it argues that "actual knowledge" is required for an FCA violation. *See* 31 U.S.C. § 3729(b); *see also Wilkins ex rel. United States v. Ohio,* 885 F.Supp. 1055, 1059–60 (S.D.Ohio 1995) (finding that the knowledge requirement is "something less than the elements of fraud [found] at common law"). For example, Plaintiffs submit that, the FCA was intended to reach "the ostrich" defendant, "who ignores or fails to inquire about readily discoverable facts which would alert him that fraudulent claims are being submitted," and who "insulate themselves by design from knowledge about the truth or falsity of a claim." 132 Cong. Rec. § 11238–04 (daily ed. Aug. 11, 1986) (remarks of Sen. Grassley).

In addition, Plaintiffs accuse Defendant of proposing a very high standard for recklessness, which is substantially higher that the formulation used by Congress in enacting the 1986 Amendments to the FCA. *See*

---

**18.** "CICN" is an acronym for a metallurgical condition known as "continuous intergranular networking" (doc.456). CICN is the complete encapsulation of interconnected grains by carbides (*Id.*). The CICN provision of the carburizing specification pertains to the test

specimens processed with the production gears (*Id.*). The presence of CICN at the surface of a test specimen would be an indication to the manufacturer that the specified parameters of the carburization process may not have been met (*Id.*).

*United States v. Krizek*, 111 F.3d 934, 941–42 (D.C.Cir.1997) (affirming the district court's determination that "reckless disregard under the FCA is properly equated with aggravated gross negligence, or gross negligence-plus"); *see also UMC Elecs. Co. v. United States*, 43 Fed. Cl. 776, 792 n. 15 (1999) (noting that reckless disregard under the FCA is the equivalent of an "aggravated form of negligence or gross negligence-plus"). Thus, Plaintiffs assert that, Defendant's attempted use of the First Amendment standard (i.e., "reckless disregard for the truth") or the recklessness standard used in securities fraud cases is misguided.

Second, Plaintiffs allege that, with all of the obvious "red flags" concerning Speco's difficulties in detecting cracks and burns in the gears places Defendant in the same position as the psychiatrist who failed to properly supervise his wife and office staff, who was found liable under the FCA for preparing bills that grossly over-billed Medicare for mental health services. *See Krizek*, 111 F.3d at 942–43. Plaintiffs assert that in the *Krizek* case, the psychiatrist-doctor was found to be reckless although he had no "actual knowledge" that his office staff had prepared incorrect bills in the past, nor had he had previous problems with Medicare. *Id.* at 942. Rather, it was later determined that the psychiatrist failed to review the bills that were sent to Medicare. *Id.* Plaintiffs submit that, like the psychiatrist in *Krizek*, Defendant had ample knowledge of problems with the Speco-made gears and also had the opportunity to correct the problem or provide notice to the Government, thus making its conduct more culpable than the psychiatrist in *Krizek*. Therefore, Plaintiffs argue that, the high knowledge standard sought by Defendant is not supported by the law.

Third, Plaintiffs allege that the undisputed cause of the 1991 Saudi incident was the in-flight failure of a Speco-manufactured Vasco gear due to grinding cracks [19] in the dampening ring grove. Plaintiffs aver that, Defendant has admitted the gear in question was cracked at the time of its delivery to Defendant by Speco, and, thus, contained the crack when the helicopter in question was subsequently delivered to the Army by Defendant. Moreover, Plaintiffs contend that Defendant knew that cracks in the gears of a helicopter could lead to a catastrophic gear failure. Thus, while allegedly turning a blind eye to its previous failed experience with the Litton-manufactured gears, Defendant allowed Speco to continue grinding the dampening ring grooves of in its helicopter gears. *See BMY–Combat Sys. v. United States*, 38 Fed. Cl. 109, 125 (1997); *see also Daff*, 78 F.3d at 1574 (holding that the defendant defrauded the government by covering up test failures). Plaintiffs argue that, the evidence demonstrates that Defendant acted at least recklessly with respect to the gear that failed in Saudi Arabia, as well as the other gears with similar defects.

Fourth, Plaintiffs further allege that, the evidence is also clear that Defendant submitted false claims in connection with the cracked gears, including the gear that caused the Saudi crash and the 1993 Ft. Meade failure. Specifically, Plaintiffs allege that, in June of 1993, a second CH–47(D) helicopter failed in flight near Ft. Meade, Maryland due to the failure of a Speco-made Vasco gear. Plaintiffs assert that, Defendant admitted the gear had a manufacturing defect, rendering it "nonconforming to contract requirements." Plaintiffs further assert that, Defendant further admitted that this gear was cracked at the time of delivery to Defendant and when it was subsequently delivered to the Army. Plaintiffs submit that, the Ft. Meade gears failed because Defendant accepted the Speco-made gear during

---

19. Grinding burns are caused by reheating during the grinding process, and it renders the metal unfit for its purpose (doc. 484). Grinding burns do not meet the hardness requirements for these gears and are a rejectable and undesirable condition (*Id.*).

"a nearly three-year hiatus" in Defendant's contractually-required, destructive testing program. Plaintiffs allege that, a government contractor's failure to conduct the contractually required product inspections is sufficient proof of reckless conduct, and, thus, satisfies the "knowing" standard under the FCA. *See Compton*, 142 F.3d at 303; *see also Daff*, 78 F.3d at 1574; *United States ex rel. Fallon v. Accudyne Corp.*, 921 F.Supp. 611, 621 (W.D.Wis.1995).

Fifth, Plaintiffs concede that, Defendant did conduct limited re-inspections of some of the Speco-made gears in question, however, Plaintiffs counter that, Defendant also failed to remove and replace all of the Speco-made gears with fully compliant gears, as well as the failure by Defendant to test for grinding burn on the gears. Plaintiffs argue that, Defendant's conduct with respect to its limited and flawed re-inspection of the Speco gears supports Plaintiffs' FCA claims. In addition, Plaintiffs submit that the Army approved of Defendant's re-inspection procedures without having the benefit of Defendant's full knowledge about Speco's major problems in regards to creating and failing to detect grinding burns. *See United States v. National Wholesalers*, 236 F.2d 944, 950 (9th Cir.1956) (holding that contracting officer's modification of the contract in order to allow a lesser performance was "void as against public policy," as contracting officers do not have power to vitiate the FCA); *see also United States ex rel. Mayman v. Martin Marietta Corp.*, 894 F.Supp. 218, 223 (D.Md.1995) ("[A] contractor who tells a government contracting officer that a claim is false still violates the statute when the false claim is submitted."). Thus, Plaintiffs argue that, Defendant's contentions about the re-inspections issue does not support its Motion for Summary Judgment.

Next, Plaintiffs assert that, it is beyond dispute that a contractor violates the FCA if he acts with the requisite state of mind, and submits a claim for payment as if the product did conform to the contract. *See United States v. Aerodex, Inc.*, 469 F.2d 1003, 1008 (5th Cir.1972).[20] Plaintiffs submit that they have identified approximately 125 gears for which no representative destructive testing was ever performed. Plaintiffs allege that, according to Sixth Circuit precedent, the parts sold to the Government without the contractually required testing are *per se* non-conforming, and, therefore, the knowing submission of claims for payment is in violation the FCA. *See Compton*, 142 F.3d at 304–05 (finding that the Army did not bargain only for brake-shoe kits that could pass the required testing, but also "for the confidence that comes with a product that has been subjected to production testing"); *accord BMY–Combat*, 38 Fed. Cl. at 125 (finding that the prime contractor violated the FCA by submitting items made by the subcontractor with the prior knowledge that the contracted parts had not been inspected as required). Moreover, Plaintiffs allege that, Defendant's continued use of Speco gears after knowing of the gears' lack of quality assurance constitutes undeniable evidence demonstrating Defendant's prior knowledge, and, therefore, supports Plaintiffs' FCA claim. *See United States v. Advance Tool Co.*, 902 F.Supp. 1011, 1016 (W.D.Mo.1995) ("If the government failed to inspect, that fact would not insulate [defendant] from liability for a false or fraudulent claim."); *see also Commercial Contractors, Inc. v. United States*, 154 F.3d 1357, 1375 (Fed.Cir.1998) (holding that the quality control violations amounted to a violation of the FCA, even though it had no significant effect on the channel's structural integrity).

Seventh, Plaintiffs maintain that Defendant's quality control efforts at Speco do

---

**20.** In *Aerodex,* the Fifth Circuit held that the defendant-contractor violated the FCA, and subsequently rejected the defendant's defenses that the: (1) bearings it sold to the government were as good as those required under the contract and (2) parts were considered interchangeable. *Id.*, 469 F.2d at 1007.

not preclude a finding of FCA liability. Rather, Plaintiffs assert that, Defendant was obligated to do more than simply impose a system of quality controls at Speco that looked good on paper or was more demanding than the requirements of Speco's other customers. Rather, Defendant was obligated, according to Plaintiffs, to make sure that the gears it accepted from Speco and later placed in the CH–47D helicopters did not have dampening ring grove cracks, burns, or other non-conformities. Furthermore, Plaintiffs allege that, Defendant knew Speco had no meaningful corrective action program and took no action other than to complain about it to Speco. In addition, Plaintiffs maintain that, Defendant failed to make any significant disclosures of these problems to the Government.

Lastly, Plaintiffs assert that, Defendant is not entitled to summary judgment on the issue of CICN in the Vasco-made gears because Defendants took no action to address the abnormal continuous carbide network findings, and never bothered to inform the Government of the allegedly abnormal findings. Plaintiffs further assert that, Defendant handled the resulting report, in a manner different from every other rejection report in the history of its relationship with Speco, by failing to route it through the appropriate Government channels. Plaintiffs allege that, there are many more examples of genuine issues of material fact relating to the issue of CICN and the FCA that make it much more than a scientific dispute, and would preclude this Court from granting summary judgment in Defendants favor. For example, Plaintiffs assert that:

(1) Defendant's claim that CICN is prohibited only in test slugs is a litigation theory belied by years of company practice;

(2) Defendant has always known that Vasco gears—and especially their dampening ring groves—contained CICN, but failed to tell the Government that it was

making gears which carried this unacceptable micro-structural condition;

(3) Senior Army engineers and scientists believe that the gears sold to the Government were non-conforming due to the existence of CICN; and

(4) Defendant's conduct when it was confronted with Speco's findings of CICN in dampening ring grooves demonstrates that it attempted to conceal the issue from cognizant Government officials.

(doc. 484). In short, Plaintiffs argue that, Defendant has attempted to escape responsibility for violations of the specifications by engaging in a semantic debate about "scientific disputes."

### B. *Count Five: The Common Law Fraud Claim*

■ To prevail on a claim of common law fraud, Plaintiffs must prove the following: (1) that a false representation, (2) that is material, (3) is made with knowledge of the falsity and with an intent to defraud, (4) with a reasonable reliance upon the false representation, and (5) that results in damages. *Wittekamp v. Gulf & Western, Inc.*, 991 F.2d 1137, 1142 (3d Cir.1993) (noting the elements of common-law fraud under Pennsylvania law); *see also Domo v. Stouffer*, 64 Ohio App.3d 43, 51, 580 N.E.2d 788, 793 (1989) (noting the elements of common-law fraud under Ohio law).

### 1. *Defendant's Position*

Defendant submits that, in order to sustain a claim at common-law for fraud, Plaintiffs must adduce evidence showing that not only did Defendant make a knowing misrepresentation, but also that it did so with the intent to defraud the Government. *See Wang*, 975 F.2d at 1420. Defendant submits that, Plaintiffs have not proved that Defendant has made any false statements concerning the gear involved in the 1991 incident, the gears currently in service, or any other gears. Defendant also submits that, Plaintiffs cannot show that Defendant knew that any such claim

for gears were false or that it acted with the requisite intent to defraud. Moreover, Defendant contends that, the Army's involvement at every stage of both of the gear's re-inspections precludes any claim that the Government justifiably relied on any representations made by Defendant.

In addition, Defendant asserts that, because the Government knew or reasonably could have learned the facts essential to this fraud claim by no later than December 21, 1992, any fraud claim that accrued prior to that date is barred by the three-year statute of limitations. *See* Title 28 U.S.C. § 2415(b) (prescribing the statute of limitations for common law fraud as three years after the right of action accrues); *see also United States ex rel. Zissler v. Regents of the Univ. of Minn.*, 992 F.Supp. 1097, 1105 (D.Minn.1998) (noting that the limitations period begins to run once the facts making up "the very essence of the right of action" are known to the responsible government officials). Specifically, Defendant alleges that, since it entered into a tolling agreement with the Government that began on December 21, 1995, any common law fraud claims that accrued prior to that date must be dismissed with prejudice. Defendant also alleges that, discovery in this action has established that with respect to the Saudi incident, Army officials with oversight for the CH–47D helicopter program knew all of the essential facts relating to any purported fraud in 1991, when the Army undertook a full investigation of the causes of the Saudi incident. Therefore, any fraud claims alleged by the Government after December 21, 1995, are time barred.[21]

### 2. *Plaintiffs' Position*

Plaintiffs assert that, the elements of federal common law fraud are very simple and are certainly met under the facts as now known. *See United States v. Hibernia Nat'l Bank,* 841 F.2d 592, 595 (5th Cir.1988) (finding that federal law governs any suits by the United States in order to recover overpayment, especially in cases where the action would have an immediate impact upon the federal treasury); *see also Stone v. United States,* 286 F.2d 56, 59 (8th Cir.1961) (holding that federal law controls actions to recover erroneous payment); *United States v. Krietemeyer,* 506 F.Supp. 289, 293 (S.D.Ill.1980) (finding that federal common law governs punitive damages in fraud action). Plaintiffs allege that the Government suffered actual damage with respect to the Speco-manufactured gears that were placed in the CH–47D helicopters due to a justifiable reliance on a pattern of affirmative misrepresentations by Defendant. *See RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,* 878 F.Supp. 16, 20 (S.D.N.Y.1995) (finding that plaintiff's securities fraud complaint satisfied the pleading requirement that fraud be pled with particularity where it alleges "a continuous and prolonged pattern of misrepresentations and omissions").

In addition, Plaintiffs contend that, the three-year statute of limitations for tort actions under 28 U.S.C. § 2415(b) is subject to the tolling provision of 28 U.S.C. § 2416(c), which excludes all periods during which the material facts "are not known, and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances." Moreover, Plaintiffs submit that, this Court has already determined that 28 U.S.C. § 2416(c) tolled the statute of limitations in this case until the Relator

**21.** In this Court's May 11, 1998 Order (doc. 152),we denied Defendant's Motion to Dismiss Count Five of the Amended Complaint based on the statute of limitations. Defendant presents many of the same or similar arguments in this Motion for Summary Judgment that it did in its previous Motion to Dismiss (*see* doc. 43). Having reviewed this matter in light of Defendant's Motion for Summary Judgment (doc. 456), the Court stands by its previous holdings on the issues presented in Defendant's Motion to Dismiss the Amended Complaint and refers the Parties to its May 11, 1998 Order for a more detailed explanation (*see* doc. 152).

filed his *qui tam* Complaint in May of 1995 (*see* docs. 2 & 152). Therefore, Plaintiffs argue that, because the DOJ is the only entity "charged with responsibility to act" in fraud cases, the statute of limitations was tolled until May 22, 1995, when the Relator filed his *qui tam* Complaint and the material facts became known to the Civil Division of the DOJ. *See Martin J. Simko Constr., Inc. v. United States*, 852 F.2d 540, 547 (Fed.Cir.1988) (finding that fraud matters are exclusively within the DOJ's authority and therefore are beyond the contracting officer's authority).

### C. Count Four: The Breach of Contract Claim

■ To establish a breach of contract, Plaintiffs must prove: (1) the existence of a contract; (2) performance by the Government; (3) a breach by Defendant; and (4) injury to the Government. *BMY–Combat*, 38 Fed. Cl. at 127; *Cleland v. Stadt*, 670 F.Supp. 814, 817 (N.D.Ill.1987).

#### 1. Defendant's Position

Defendant argues that, if the common-law fraud and FCA claims are eliminated, any breach of contract claims should be dismissed for want of jurisdiction, pursuant to the Contract Disputes Act of 1978 (hereinafter, the "CDA"), Title 41 U.S.C. § 605(a) ("[A]ll claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer."); *see also United States v. Unified Indus., Inc.*, 929 F.Supp. 947, 949–51 (E.D.Va.1996); *United States v. Rockwell Int'l Corp.*, 795 F.Supp. 1131, 1134 (N.D.Ga.1992) (holding that federal courts do not have jurisdiction to hear government claims that are subject to the CDA); *United States v. Hydraire, Inc.*, No. 94–C–4414, 1995 WL 86733, at **5–6 (N.D.Ill. Feb.27, 1995) (permitting the district court to retain jurisdiction over a breach of contract claim only where the allegations of fraud were sufficient to survive a motion to dismiss). Defendant alleges that, because

Plaintiffs cannot prove that it engaged in any fraudulent conduct, Plaintiffs' contract claim must be dismissed for want of jurisdiction. *See Unified Indus.*, 929 F.Supp. at 951 n. 6 (finding that where fraud allegations are unfounded, common-law contract claims may be dismissed and submitted to the contracting officer).

Defendant sets forth an alternative argument contending that, the Government has failed to take the preliminary steps required to assert any contract claims because it has neither revoked acceptance of the helicopters nor invoked its rights under the warranty provisions of the contract, except as to the gears removed from service in 1991 and 1993. *See East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 872–73, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986); *see also United States v. HydroAire, Inc.*, No. 94–C–4414, 1997 WL 160761, at **12–13 (N.D.Ill. Apr.3, 1997); *Spandome Corp. v. United States*, 32 Fed. Cl. 626, 630 (1995). Furthermore, Defendant alleges that, it has met its obligations under the contract and to the Government for the gears removed from service in 1991 and 1993 by replacing them, and, thus, Plaintiffs' contract claims have no merit.

In addition, Defendant submits that, the Government cannot maintain an action for breach of warranty because it failed to comply with the "written 90 day notification requirement" that is allegedly contained in its prime procurement contract with Defendant. Defendant asserts that, the Government has not provided such notice to Defendant and the Government has never returned any allegedly defective gear to Defendant. Thus, Defendant argues that, the Government's failure to comply with these warranty provisions bars any claim for breach of warranty.

#### 2. Plaintiffs' Position

Plaintiffs maintain that, there is no basis for the granting of summary judgment for Defendant on the FCA or common law claims, therefore, this Court should also

retain jurisdiction over the contract claims as well. Moreover, Plaintiffs assert that, this Court has already decided that we have jurisdiction over the Government's contract claim in this action as well (*see* doc. 152). Plaintiffs concede that, it is true that when a district court dismisses all claims over which the court had original jurisdiction, the court "may decline to exercise supplemental jurisdiction" over the remaining claims. 28 U.S.C. § 1367(c)(3) (West 1999). However, Plaintiffs allege that, the district court, in its discretion, may instead continue to exercise supplemental jurisdiction over the remaining claims. *See Stevenson v. Severs,* 158 F.3d 1332, 1334 (D.C.Cir.1998). Therefore, Plaintiffs argue that, to the extent this Court may have the occasion to exercise this discretion, it should continue to assert jurisdiction over the contract claim, because to do otherwise would waste the judicial resources that this Court has already expended.

### D. *Claims Two & Three: Payment by Mistake & Unjust Enrichment:*

#### 1. *Defendant's Position*

Defendants contend that it is black-letter that where the existence of a contract is proved, quasi-contractual claims such as unjust enrichment and payment by mistake cannot be brought. *See United States v. EER Sys. Corp.,* 950 F.Supp. 130, 133 (D.Md.1996) ("[C]ommon law claims are quasi-contractual or tort-based that are inappropriate claims when there is an express contract."); *see also Trauma Serv. Group, Ltd. v. United States,* 33 Fed. Cl. 426, 432 (1995) ("[T]here can be no implied contract between the parties when an express contract covers the same subject."). Since discovery has established the existence of express contracts for the helicopter, Defendant argues that these same claims must be dismissed. Defendant submits that, although the alternative pleading rules may allow for pleading both breach of contract and quasi-contractual remedies, once an express contract is prov-

en on summary judgment, the qausi-contractual claims must be dismissed. *See Nematollahi v. United States,* 38 Fed. Cl. 224, 235 (1997) ("Moreover, there can be no implied-in-law contract and, thus, no claim for unjust enrichment, when an express contract covering the same subject exists.")

#### 2. *Plaintiffs' Positions*

Plaintiffs allege that, the "existence of an express contract does not necessarily preclude recovery under the theories of unjust enrichment, restitution of payment, or payment under a mistake of fact." *U.S. ex rel. O'Keefe v. McDonnell Douglas Corp.,* 918 F.Supp. 1338, 1344 (E.D.Mo. 1996). Plaintiffs argue that, they should be permitted to pursue its theories of alternative contract, payment by mistake and unjust enrichment claims, and that the granting of summary judgment is inappropriate at this time.

On July 19, 1999, Defendant filed a very detailed, comprehensive, and lengthy Reply brief in which Defendant counters that Plaintiffs' legal theories defending this Motion are either without merit, without legal relevance, or are without sufficient evidence to meet their prima facie burden (*see* doc. 491). In addition, Defendant re-argues many of the points it asserted in its original Motion for Summary Judgment (doc. 456). For the sake of brevity and not wanting to re-review all of Defendant's arguments that were asserted in its Reply brief, the Court will take Defendant's Reply into our consideration on this matter, but will not repeat those arguments here.

### D. *Defendant's Motion for Summary Judgment is Denied*

█ To survive a motion for summary judgment, Plaintiffs must establish evidence on which a reasonable jury could find for Plaintiffs. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. A reviewing court must view the evidence in a light that is most favorable to the non-moving party. *See Celotex Corp.,* 477 U.S. at 322, 106

S.Ct. 2548. Having reviewed the affidavits, deposition testimony, briefs, exhibits, and all other materials furnished in support and in opposition to Defendant's Motion for Summary Judgment (doc. 456), and after hearing the Parties arguments and representations of counsel at the August 12th hearing, the Court hereby DECLARES that there are genuine issues of material facts as to the claims set forth above. Consequently, the Court must DENY Defendant's Motion for Summary Judgment (doc. 456).

## II *Plaintiffs' Motion for Partial Summary Judgment (doc. 457)* [22]

On June 15, 1999, Plaintiffs filed a Motion for Partial Summary Judgment in Regards to Liability as to Helicopters Sold with Defective Gears (doc. 457). Thereafter, Defendant filed its Response (doc. 481), followed by Plaintiffs' Reply (doc. 495).

In their Motion for Partial Summary Judgment, Plaintiffs initially assert numerous alleged facts that tend to prove that Defendants were fully aware of the gear defects, and, nonetheless, submitted false claims to the Government for payment in violation of the FCA. Plaintiffs offer a memorandum, dated October, 1982, written by Mr. Richard Fatland, the Director of Quality Assurance at The Boeing Helicopter Company, concerning the susceptibility of Vasco gears to burning and cracking during the grinding process (doc. 457,

Ex. 1).[23] Plaintiffs conclude their Motion by moving this Court to grant their Motion for Partial Summary Judgment due to Defendant's knowing delivery of non-conforming helicopters, transmissions and gears due to their allegedly cracked and untested condition. *See Compton*, 142 F.3d at 304–305 (affirming the lower court's conclusion that the defendant had submitted false claims by submitting invoices for payment of untested shoe kits).

### A. *Plaintiffs' Position*

Plaintiffs allege that, Defendant was aware of the grinding cracks in the dampening ring grooves that were manufactured initially by the Litton Corporation. In addition, Plaintiffs allege that, Defendant subsequently accepted gears with ground dampening ring grooves from Speco despite knowing that the same gears produced by Litton had grinding cracks in their dampening ring grooves as well. Moreover, Plaintiffs contend that, Defendant was aware of the related problems of grinding burns and the failure to detect such burns at Speco. Plaintiffs argue that, the 1991 Saudi Arabia incident was caused by a crack in the dampening ring groove of a Speco-manufactured gear. Furthermore, Plaintiffs submit that, the 1993 Ft. Meade incident was caused by a crack in a Speco-manufactured gear as well.

Plaintiffs also submit that, despite deteriorating conditions at Speco, Defendant continued to place Speco gears in the heli-

22. The Court notes that many of the same or similar arguments, positions, and legal theories that were asserted by the Parties in Defendant's Motion for Summary Judgment (*see* docs. 456, 484 & 491) are also included in Plaintiffs' Motions for Partial Summary Judgment (doc. 457, 458 & 459). This Court will refrain from being repetitive when possible and will summarize many of the Parties' positions for the sake of brevity. Nonetheless, this Court will consider *all* of the Parties' arguments in our deliberations.

23. The Fatland Memorandum states, in pertinent part:

Approximately six months ago, the Litton Quality Control System detected grinding cracks in some spiral bevel gear dampening ring grooves. It was concluded that the size and location of these grinding cracks were such that they are not always readily detectable by the current engineering requirement for florescent magnetic particle inspection....

The case of the cracks was determined to be the result of BMS 7–223 steel material [Vasco] susceptibility during grinding operations....

The solution to the groove crack problems was to revise the drawings to permit the elimination of grinding in the groove. doc. 457, Ex. 1.

copters. Furthermore, Defendant failed to conduct, Plaintiffs allege, the contractually required destructive testing on the gears in question. Plaintiffs further allege that, Defendant knew that the annual destructive testing was not being done as contractually required. Therefore, Plaintiffs argue that, partial summary judgment is appropriate against Defendant for several reasons.

First, Plaintiffs allege that, Defendant violated the FCA by certifying contract compliance for helicopters that Defendant knew contained cracked gears and for helicopters that Defendant knew contained Speco gears for which destructive testing was required, but was not actually done. Specifically, Plaintiffs assert that, Defendant knowingly submitted false claims for payment to the Government for helicopters with cracked and untested gears. *See* 31 U.S.C. §§ 3729(a)(1) & (2); *see also United States v. Neifert–White Co.*, 390 U.S. 228, 232, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968) (finding that the FCA statute was "intended to reach all types of fraud, without qualification, that might result in a financial loss to the [g]overnment"); *Rainwater v. United States*, 356 U.S. 590, 592, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958) (noting that the purpose of the FCA is defined broadly in order "to protect the funds and property of the [g]overnment from fraudulent claims, regardless of the particular form, or function, [or] the government instrumentality upon which such claims were made").

Second, Plaintiffs contend that, Defendant knew that the helicopters were nonconforming because they contained cracked untested gears. Plaintiffs assert that Defendant knew of, recklessly disregarded, or was deliberately ignorant to the falsity of the submitted claims. *See Hagood*, 929 F.2d at 1421 (finding that the FCA specifically states that, "no proof of specific intent to defraud is required" to establish a violation of the Act). Moreover, Plaintiffs submit that, Defendant knew there was no representative annual

destructive testing that were being performed on the Speco transmission gears, as required by the contract. *See Compton*, 142 F.3d at 305 n. 8 (affirming the lower court's findings of FCA liability against Midwest Specialties and concluding that "the government did not bargain only for plug-welded brake shoes that could withstand a certain amount of force, [but that the government] also bargained for the confidence that comes with a product that has been subjected to product testing"). Thus, Plaintiffs argue that, summary judgment is appropriate under the facts of this case.

Third, Plaintiffs assert that, Defendant breached its contracts with the Government by delivering helicopters which contained cracked gears for which no representative destructive testing had been performed. Plaintiffs also assert that, the defects in the gears within these helicopters are clearly latent defects which could not have been discovered by the Government through reasonable observation or inspection made at the time of acceptance. *See* F.A.R. § 452.246–2(k). Therefore, Plaintiffs argue that, the Government's so-called "acceptance" of the helicopters containing these gears does not preclude the Government from asserting a breach of contract claim against Defendant.

### B. *Defendant's Position*

In its Response (doc. 481), Defendant asserts that, it had no knowledge that the Speco-manufactured spiral bevel gears that were delivered to the Army contained microscopic grinding cracks. Defendant also asserts that, it complied with its contractual requirements regarding destructive testing of the gears. Therefore, Defendant argues that, Plaintiffs' Partial Motion for Summary Judgment should be denied as to the FCA and the breach of contract claims. Defendant sets forth several specific reasons why it believes summary judgment on behalf of Plaintiffs is inappropriate.

First, Defendant asserts that, there is no evidence that establishes Defendant disregarded any information relative to the quality or integrity of the Speco gears. Defendant submits that, one reason. for this assertion is that dampening ring groove can be properly manufactured either through grinding or turning. In addition, Defendant maintains that, its magnetic particle specification is more than adequate enough to detect cracks in the dampening ring groves. Defendant further maintains the it had no knowledge, prior to the 1991 incident, that Speco's magnetic particle inspections had ever failed to detect microscopic cracks.

Second, Defendant alleges that, it diligently pursued corrective action when it learned, after the 1991 incident, that Speco's inspection problems were mostly due to human error. As a result of this determination, Defendant further alleges that, all of Speco inspectors were retrained and re-certified in the areas of non-destructive testing. In addition, Defendant contends that, it pursued corrective action when it learned of Speco's "nital etch" problems as well.

Third, Defendant asserts that, Plaintiffs have not and cannot establish a claim for violation of the FCA due to the fact that Plaintiffs cannot establish the requisite intent element. Furthermore, Defendant asserts that, the conduct alleged by Plaintiffs does not constitute "knowing" conduct within the meaning of the FCA. For example, Defendant argues that, there is no evidence that it was aware of deficiencies in Speco's inspection capabilities prior to the 1991 incident, nor was there any deliberate ignorance of such information.

Fourth, Defendant alleges that, Plaintiffs have presented no evidence that Defendant recklessly disregarded any information relative to the gear which failed at Ft. Meade or the gears that were removed from service thereafter. Moreover, Defendant maintains that, not only was there no contractual obligation to perform annual destructive testing on the spiral bevel gears, but also those instructions are not incorporated in Defendant's contracts with the Army. Rather, Defendant asserts that, the applicable quality assurance operating instruction does not require annual destructive testing.

Fifth, Defendant avers that, it did conduct periodic destructive testing at Speco in a rational and prudent manner, consistent with the terms of the contract and its quality assurance plan. Since Plaintiffs have failed to present any evidence of knowing conduct by Defendant relative to the destructive testing requirement, Defendant alleges that, Plaintiffs' Motion in regards to its FCA claims should be denied.

Lastly, Defendant avers that, this Court lacks jurisdiction over the breach of contract claims because it does not involve fraud, and, thus, exclusive jurisdiction over the action is governed by the CDA. Therefore, Defendant argues that, Plaintiffs remedies are limited to those available under the warranty provisions of the contract and Defendant further argues that, it has satisfied its warranty obligations under the contract.

On July 19, 1999, Plaintiffs filed a very detailed, comprehensive, and lengthy Reply brief in which Plaintiffs counter that Defendant's legal theories defending this Motion are either without merit, without legal relevance, or are without sufficient evidence to prevent this Court from granting their Partial Motion for Summary Judgment (*see* doc. 495). In addition, Plaintiffs re-argue many of the points that they asserted in their original Motion for Partial Summary Judgment (doc. 457). For the sake of brevity and not wanting to re-review all of Plaintiffs' arguments that were asserted in its Reply brief, the Court will take Plaintiffs' Reply brief into our consideration on this matter, but will not repeat those arguments here.

### C. *Plaintiffs' Motion for Partial Summary Judgment is Denied*

To survive a motion for summary judgment, Defendant must establish evidence

on which a reasonable jury could find for Defendant. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. A reviewing court must view the evidence in a light that is most favorable to the non-moving party. *See Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548. Having reviewed the affidavits, deposition testimony, briefs, exhibits, and all other materials furnished in support and in opposition to Plaintiffs' Motion for Partial Summary Judgment (doc. 457), and after hearing the Parties arguments and representations of counsel at the August 12th hearing, the Court hereby DECLARES that there are genuine issues of material facts as to the claims set forth above. Consequently, the Court must DENY Plaintiffs' Motion for Partial Summary Judgment (doc. 457).

### III. *Plaintiffs' Motion for Partial Summary Judgment (doc. 458)*

On June 15, 1999, Plaintiffs filed a Motion for Partial Summary Judgment in Regards to Defendant's Third Affirmative Defense in Relation to the High-Value Items Clause and Liability Insurance Coverage (doc. 458). Thereafter, Defendant filed its Response (doc. 482), followed by Plaintiffs' Reply (doc. 493).

In their Motion for Partial Summary, Plaintiffs move this Court to grant them summary judgment as to Defendant's Third Affirmative Defense which alleges that damages are barred by the inclusion of the High-Value Items Clause[24] in the contract between the Government and Defendant. *See* 48 C.F.R. §§ 46.803(d)(2)-(3). Plaintiffs allege that, the High-Value Items Clause in the contract at issue is inapplicable because: (1) Defendant has insurance; (2) Defendant's insurance covers its liability arising from fraudulent acts which comprise the alleged FCA violations and its associated common-law fraud claims; and (3) Defendant's insurers are estopped from denying coverage in this action since it has already paid for all submitted defense costs and has issued no reservation of rights letter in the over two years since the insurers received notice of this FCA litigation.

### A. *Plaintiffs' Position*

Defendant's Third Affirmative Defense is brought on the grounds that the High-Value Items Clause (hereinafter, the "HVIC"), set forth in Title 48 of the Code of Federal Regulations ("C.F.R."), § 46.800 *et seq.* (1999), and incorporated into the contracts between the Government and Boeing, allegedly provides no defense to Plaintiffs' claims against Defendant for violations of the FCA or common-law doctrines, such as fraud and unjust enrichment.[25] In their Motion for Partial Summary Judgment, Plaintiffs assert that they are not arguing that the HVIC is void and without effect. Rather, Plaintiffs ar-

---

24. The contracts between the Government and Defendant incorporate § 52.246-24 of the Federal Acquisition Regulations and is known as the High-Value Items Clause. The Federal Acquisition Regulations are codified in Title 48 of the Code Of Federal Regulations and are usually found under the same or similar section numbers. Defendant has raised as its Third Affirmative Defense the HVIC in an attempt to limit its liability damages in this action. The expressed language of the HVIC limits Defendant's liability for the loss or damage suffered by the Government only if Defendant does not carry insurance or establishes a self-insurance reserve that covers its liability. *See* F.A.R. § 52.246-24; *see also See* Title 48 C.F.R. § 52.246-24 (West 1999), "Limitation of Liability—High-Value Items".

25. Moreover, Plaintiffs have contended in previous motions for summary judgment that were submitted to this Court that, while the HVIC may be applicable to its breach of contract claim against Defendant, it also believes that there may be sufficient evidence of a "lack of good faith" by Boeing's "managerial personnel" in order for Defendant to attempt to bring this case within an exception to the HVIC. *See* 48 C.F.R. § 46.803(d)(2). Nonetheless, Plaintiff submit that, whether there exists such evidence is irrelevant to this Motion, since they have reason to believe that Defendant has insurance coverage which renders the HVIC *per se* inapplicable. *See* 48 C.F.R. § 46.803(d)(3).

gue, its legal effect may be to limit Boeing's liability to lessen damages in a breach of contract action for any loss, destruction, or damage to the Government's property in situations where there is no proof of 'willful misconduct' or a 'lack of good faith' by Boeing's 'managerial personnel'. *See* 48 C.F.R. § 46.803(d)(2)(West 1999).

Moreover, Plaintiffs assert that, the HVIC is inapplicable in this action because the FCA is a type of claim for fraud for which Defendant admits it has liability insurance coverage. This evidence of insurance, Plaintiffs allege, can be proven by the fact that Defendant's liability insurer is continuing to cover Defendant's litigation cost and by the fact that the same insurer has not issued a denial of coverage letter or a reservation of rights letter expressing its intent not to insure. Therefore, Plaintiffs argue that, since there is insurance coverage, the HVIC, by its express terms, does not apply in this action to protect Defendant from liability.

### B. *Defendant's Position*

In its Response, Defendant alleges that, pursuant to the HVIC, the Government agreed to hold Boeing harmless for the loss or damage to high-value government property, including any defects or deficiencies that may have been present in the CH–47(D) helicopters that Boeing delivered under the primary military contract. The HVIC, Defendant submits, bars the Government from seeking compensation for any loss or damage to the two helicopters under any of the claims asserted. Defendant submits that, even if the Court finds that the High–Value Items Clause and the FCA are in conflict with each other, then the Government is nonetheless bound by its prior promises under the HVIC.

Furthermore, Defendant alleges that, it has no liability insurance coverage for government property in this case where the Government has assumed liability under the HVIC. Defendant further alleges that,

its notification to its insurers of the pendency of this lawsuit is not evidence of insurance coverage because Defendant's notice expressly stated that it has no coverage for claims subject to the HVIC. Furthermore, Defendant asserts that, the mere fact that Defendant's insurers have paid some of Defendant's costs have no bearing on the entirely separate question of whether Defendant has coverage for claims subject to the HVIC. In addition, Defendant contends that, Plaintiffs, who have the burden of proof on this issue, have failed to produce any evidence that Defendant has insurance coverage for claims subject to the HVIC. Moreover, Defendant argues that, all of the available evidence establishes that Defendant's insurers, like Defendant itself, believe that there is no coverage for claims subject to the HVIC.

On July 19, 1999, Plaintiffs filed their Reply brief in which Plaintiffs counter that Defendant's legal theories defending this Motion are either without merit, without legal relevance, or without sufficient evidence to prevent this Court from granting their Partial Motion for Summary Judgment (*see* doc. 493). In addition, Plaintiffs re-argue many of the points they asserted in their original Motion (doc. 458). For the sake of brevity and not wanting to re-review all of Plaintiffs' arguments that were asserted in its Reply brief, the Court will take Plaintiffs' Reply into our consideration on this matter, but will not repeat those arguments here.

### C. *Plaintiffs' Motion for Partial Summary Judgment is Denied*

To survive a motion for summary judgment, Defendant must establish evidence on which a reasonable jury could find for Defendant. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. A reviewing court must view the evidence in a light that is most favorable to the non-moving party. *See Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548. Having reviewed the affidavits, deposition testimony, briefs, exhibits,

and all other materials furnished in support and in opposition to Plaintiffs' Motion for Partial Summary Judgment, and after hearing the Parties arguments and representations of counsel at the August 12th hearing, the Court finds that Plaintiffs' Motion for Partial Summary Judgment as to Defendant's Third Affirmative Defense (doc. 458), in fact, asks this Court to essentially answer two questions.

First, is Defendant barred from asserting as its Third Affirmative Defense the HVIC in relation to the FCA claim? The answer to that has already been answered by this Court in its November 2, 1999 Order.[26] In that Order, we held that Defendant's assertion of its Third Affirmative Defense in relation to the FCA claim (i.e., the HVIC) was barred due to the Court's finding that the HVIC was inapplicable as a defense to a FCA action. Therefore, the Court has already dismissed Defendant's assertion of its Third Affirmative Defense, the HVIC, in relation to the FCA claim and Plaintiffs' Motion on this issue has already been GRANTED by this Court, pursuant to our November 2, 1999 Order holding the same (*see* doc. 554).

Second, having already found that the HVIC defense is inapplicable in an FCA action, the question of whether or not Defendant has liability insurance coverage remains. The Court finds Defendant's brief to be more persuasive on this issue, and, thus, we are unable to hold as a matter of law that in light of this Court's November 2, 1999 Order (*see* doc. 554) and Defendant's Response brief (*see* doc. 482), that Defendant actually has liability insurance coverage in order to cover it from FCA, fraud and common law liability claims, if Defendant is later found to be liable at trial. The Court believes that the issue of insurance is one of the genuine issues of material fact, and, as such, would be better left for the trier of facts' determination at

trial once all of the issues, facts, legal theories, and defenses are more fully developed by the Parties. Therefore, we find that it would be inappropriate to grant summary judgment on the issue of liability insurance to either Party at this time.

In addition, in light of the fact that the Court's November 2, 1999 Order (doc. 554) holding that the HVIC was not applicable to a claim brought under the FCA, we believe that it is important to further clarify the Court's reasoning on the issue of the HVIC in relation to the issues that are presently before this Court. As previously stated, the regulations that gave rise to the HVIC explicitly prescribe two exceptions to the defense that the HVIC normally provides to contractors. One exception is if there is sufficient evidence of a lack of good faith by Defendant's managerial personnel,[27] and the other applies if it is determined that Defendant has insurance coverage which renders the HVIC *per se* inapplicable.[28] The Court also finds that there exist genuine issues of material fact as to whether or not either or both of these exceptions to the HVIC is applicable to the facts of this case; especially if it should later be determined that the HVIC regulation is indeed enforceable and applicable to the issues discussed above.

Furthermore, since the issue of the applicability of the HVIC is one of first impression and will most likely be subject to appellate review, in an effort to conserve judicial resources, we believe that it is appropriate for a jury to determine if the facts support either or both of the aforesaid exceptions to the HVIC. If our interpretation of the applicability of the HVIC in relation to the FCA is in error, then the reviewing court will have before it a complete record, including the issues relating any bad faith involving Defendant's managing personnel and Defendant's liability coverage. By establishing such a record

---

**26.** *See United States ex rel. Roby v. Boeing Co.,* 73 F.Supp.2d 897, 909–10 (S.D.Ohio) (doc. 554).

**27.** *See* 48 C.F.R. § 46.803(d)(2).

**28.** *See* 48 C.F.R. § 46.803(d)(3).

at trial, the reviewing court will have before it the issue of whether or not the HVIC exceptions are available to the Parties, and, therefore, it will be able to render an appropriate decision, without having to remand this case back to the district court for an evidentiary hearing on these very issues.

Therefore, this Court hereby DECLARES that there are genuine issues of material facts as to the claims set forth above. Consequently, the Court finds that Plaintiffs' Motion for Summary Judgment is hereby GRANTED–IN–PART as to the issue of Defendant's assertion of its Third Affirmative Defense in relation to the FCA claim (*see* doc. 554) and is hereby DENIED–IN–PART as to the issue of the applicability of Defendant's liability coverage to Plaintiffs' FCA and common-law claims (doc. 458).

## IV. *Plaintiffs' Motion for Partial Summary Judgment (doc. 459)*

■ On June 15, 1999, Plaintiffs filed their Motion for Partial Summary Judgment as to Defendant's Fourth, Eighth, and Twelfth Affirmative Defenses (doc. 459).[29] Defendant filed its Response on July 6, 1999 (doc. 483), and Plaintiffs filed their Reply shortly thereafter (doc. 492).

Plaintiffs allege in their Motion for Partial Summary Judgment (doc. 459) that, Defendant, in its Answer filed on or about May 21, 1998 (*see* doc. 161), raises several defenses that, as a matter of law, cannot properly be invoked against the United States. Specifically, Plaintiffs allege that, Defendant's Fourth Affirmative Defense of Estoppel and its Eighth Affirmative Defense of Laches cannot properly be in-

voked against the Government. In addition, Defendant's Twelfth Affirmative Defense of Waiver, Estoppel, or Ratification, Plaintiffs argue, is no defense to a FCA violation.

### A. *Defendant's Twelfth Affirmative Defense*

Defendant's Twelfth Affirmative Defense provides, in pertinent part:

> The [G]overnment was integrally involved in the oversight of Speco, the mishap investigations and determining the scope and kind of re-inspections to be conducted in 1991 and 1993. The government cannot now disclaim its own independent responsibility relative to the CH–47(D) program by making allegations against [Defendant]. Fundamental principles of equity preclude the use of the legal process to achieve this end.

(doc. 161).

### 1. *Plaintiffs' Position*

Plaintiffs initially assert that, it is well-settled that government knowledge is not a valid defense to an action under the FCA, but, rather, Plaintiffs contend that, only the state of mind of the defendant is relevant:

> That a defendant has disclosed all of the underlying facts to the government may ... show that the defendant had no intent to deceive. But what constitutes the offense is not the intent to deceive but the knowing presentation of a claim that is either "fraudulent" or simply "false." The requisite intent is the knowing presentation of what is known to be false. That the relevant govern-

29. Defendant asserts the following Affirmative Defenses to the allegations set forth in the Amended Complaint: (1) the failure to state a claim upon which relief can be granted; (2) the fraud cause of action is time-barred; (3) the damages sought are barred by the High–Value Items Clause; (4) estoppel due to the High–Value Items Clause; (5) consequential damages are not available; (6) no injury in fact; (7) the failure to plead fraud with partic-

ularity; (8) barred by laches; (9) the existence of an express contract; (10) the special damages are not pled with specificity; (11) punitive damages are not pled with particularity; and (12) the doctrine of equitable estoppel (doc. 161). Note: Defendant's Third Affirmative Defense, the High–Value Items Clause, was dismissed pursuant to this Court's Order of November 2, 1999 (doc. 554).

ment officials knows of the falsity is not in itself a defense.

*Hagood,* 929 F.2d at 1421 (citing 31 U.S.C. § 3729(a)(1) & (2) (West 1999)); *see also Hughes Helicopters,* 71 F.3d at 326 (finding that "government knowledge is no longer an automatic bar" to a finding of a violation under the FCA); *U.S. ex rel. Durcholz v. FKW, Inc.,* 997 F.Supp. 1159, 1167 (S.D.Ind.1998) ("[C]ourts have to decide on a case-by-case basis whether a FCA claim based on information in the government's possession can succeed."); *Lamers,* 998 F.Supp. at 988 (finding that governmental knowledge is not an automatic exoneration); *United States v. Incorporated Village of Island Park,* 888 F.Supp. 419, 442 (E.D.N.Y.1995) (same). Plaintiffs do concede that governmental knowledge is relevant only in certain limited circumstances where full disclosure was made to the Government by the time the claim was submitted:

> The fact that a contractor has fully disclosed all information to the government may show that the contractor has not "knowingly" submitted a false claim that is, that it did not act with "deliberate ignorance" or "reckless disregard for the truth."

*Kreindler,* 985 F.2d at 1157 (citations omitted).

Plaintiffs allege that, since Defendants did not make a full disclosure to the Government, this omission prevents Defendant from asserting its Twelfth Affirmative Defense in an attempt to defend against Plaintiffs' FCA claim. Furthermore, Plaintiffs contend that, the presence of governmental inspectors on site at Defendant's facility does not insulate a contractor from FCA liability, and does not equate to government knowledge that the contractor's products were defective:

> The fact that [the government] worked closely with [the contractor] does not automatically connote government knowledge. The government cannot be expected to know of every deviation from contract specification. It could not

have known from a reasonable inspection of the DD250 forms and the howitzers that 100% RT, MT and dimensional inspections had not been performed. Under the contract, [the contractor] possessed the burden of disclosing the noncompliance. It is true that [the government] knew of problems with the TMB rail areas and altered the RT inspection requirements accordingly. However, the inspections at issue here deal with the TMB journal bearing areas. [The government] could not have detected the failure to conduct these inspections absent notification by [the contractor] of the noncompliance.

*BMY–Combat,* 38 Fed. Cl. at 119. In addition, Plaintiffs' submit that the Army's participation in the crash investigations and re-inspections have no relevance to Defendant's state of mind and cannot possibly show that Defendant did not act "knowingly" within the meaning of the FCA.

Plaintiffs also contend that, Defendant's Twelfth Affirmative Defense of waiver, ratification, and estoppel must fail as well. First, Plaintiffs argue that, a government official does not have the authority to ratify fraudulent submissions to the Government made in violation of the FCA. *See National Wholesalers,* 236 F.2d at 950 ("We do not believe that the Congress ever intended that contracting officers should have the power to vitiate false claims"); *see also United States v. Levering,* 455 F.Supp. 1165, 1168 (D.Del.1978). Second, Plaintiffs assert that, a government employee cannot authorize a contractor to violate federal law any more than a government employee can ratify a violation of the FCA after the fact:

> Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of the law ... those who deal with the [g]overnment are expected to know the law and may not rely on the conduct of [g]overnment agents contrary to law.

*Heckler v. Community Health Services,* 467 U.S. 51, 63, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984); *see also Mayman,* 894 F.Supp. at 223 (D.Md.1995) (citing *Hagood,* 929 F.2d at 1421) ("[A] contractor who tells a government contracting officer that a claim is false still violates the statute when the false claim is submitted.").

Third, Plaintiffs submit that, in the absence of any evidence of affirmative Government misconduct in regards to its FCA claims against Defendant, the Government's acts or omissions cannot prevent it from asserting its rights over public funds. *See Reich v. Youghiogheny & Ohio Coal Co.,* 66 F.3d 111, 116 (6th Cir.1995) (finding that affirmative misconduct by governmental actors is required to equitably estop the government from asserting its claims); *see also United States v. Guy,* 978 F.2d 934, 937 (6th Cir.1992) (holding that equitable is estoppel generally not available against the government). Plaintiffs argue that, Defendant cannot assert, under its Twelfth Affirmative Defense, an issue of estoppel in order to "retain money that it should never have received in the first place." *Heckler,* 467 U.S. at 61–62, 104 S.Ct. 2218.

## 2. *Defendant's Position*

Defendant counters in its Response that, as a matter of law, government knowledge is a well-recognized defense to the FCA and common-law fraud claims when the Government has alleged that Defendant had withheld information from the Government. *See Boisjoly,* 706 F.Supp. at 809 ("[C]ourts have disallowed FCA claims where the [g]overnment knew, or was in possession at the time of the claim, all of the facts that make the claim false."); *see also Hindo,* 65 F.3d at 613 (finding that government knowledge and disclosure by the contractor is relevant because in order for an FCA violation to occur, "the claim must be a lie"); *Lamers,* 998 F.Supp. at 988 ("Since the crux of an FCA violation is intentionally deceiving the government, no violation exists where the government has

not bee deceived."). Defendant argues that, government knowledge is especially relevant to an allegation based on "reckless disregard". *See Hagood,* 929 F.2d at 1421 ("[T]he knowledge possessed by officials of the United States may be highly relevant. Such knowledge may show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth .").

Moreover, Defendant maintains that, government knowledge precludes FCA and fraud liability in this case, and, thus, Defendant argues that, its Twelfth Affirmative Defense is valid and should not be precluded by summary judgment. First, Defendant alleges that, the Government was apprized of all relevant facts concerning CICN. *See Lamers,* 998 F.Supp. at 988 ("[N]o violation [of the FCA] exists where the government has not been deceived."); *see also Hughes Helicopters,* 71 F.3d at 328 (finding that when government representatives are made aware of alleged discrepancies, a contractor could not have "knowingly" submitted a false claim). Second, Defendant submits that, the Government had full knowledge and participation in the 1991 and 1993 re-inspections, and, thus, preclude FCA liability on the part of Defendant:

[T]he "knowing" submission of fraudulent claims is logically impossible when responsible government officials have been fully apprized of all relevant information. Since the crux of an FCA violation is intentionally deceiving the government, no violation exists where the government has not been deceived.

*Lamers,* 998 F.Supp. at 988; *see also X Corp.,* 816 F.Supp. at 1093–94 (holding that the contractor's disclosure to the government "militates persuasively" against a finding that the contractor "knowingly" presented a false claim to the government).

Third, Defendant asserts that, the Government's prior knowledge of the problems at Speco and its decision to independently contract for Speco gears, preclude a find-

ing that Defendant was reckless. *See Lamers*, 168 F.3d at 1019–20; *see also Hughes Helicopters*, 71 F.3d at 328 (rejecting a FCA claim because the Army's technical representatives were knowledgeable about the difficulties in testing its product).

Fourth, Defendant contends that, its disclosures of quality issues to the Government negates any findings of reckless disregard or deliberate indifference in relation to the following quality assurance issues: (1) the dampening ring grooves; (2) the "nital etch" testing; and (3) the issues raised and addressed at Defendant's Coordination Meetings. Thus, Defendant counters that, the "evidence" proffered by Plaintiffs to show Defendant's alleged lack of knowledge not only supports the correctness of Defendant's Twelfth Affirmative Defense as a matter of law, but also deflects Plaintiffs' assertions that Defendant deliberately disregarded the problems encountered by Speco. Therefore, Defendant argues that, its defense of governmental knowledge is relevant and should not be dismissed.

### B. *Defendant's Fourth and Eighth Affirmative Defenses*

In its Fourth Affirmative Defense, Defendant contends:

> The [G]overnment, having included the High–Value Items Clause in its contract with [Defendant], is estopped from seeking the damages set forth in the Amended Complaint.

(doc. 161). Defendant's Eighth Affirmative Defense asserts that, "the [G]overnment's claims are barred by laches" (*Id.*).

### 1. *Plaintiffs' Position*

Plaintiffs direct the Court's attention to the fact that, as of the date of their Motion for Partial Summary Judgment, the legal sufficiency of the HVIC as a defense in this case is currently pending before this Court as the subject matter of separate cross-motions for partial summary judgment (*see* docs. 296 & 340).[30] Regardless of the outcome of those motions, Plaintiffs argue that the Court should grant summary judgment to Plaintiffs as to Defendant's Fourth Affirmative Defense because the defense relies on theories of estoppel and laches, which does not apply in this case. *See United States v. Summerlin*, 310 U.S. 414, 416, 60 S.Ct. 1019, 84 L.Ed. 1283 (1940) ("It is well settled that the United States is not ... subject to the defense of laches in enforcing its rights."); *see also Holmberg v. Armbrecht*, 327 U.S. 392, 395, 66 S.Ct. 582, 90 L.Ed. 743 (1946) ("If Congress explicitly puts a limit upon the time for enforcing a right which it created, there is the end of the matter. The Congressional statute of limitations is definitive."); *United States v. Peoples Household Furnishings, Inc.*, 75 F.3d 252, 254 (6th Cir.1996) (noting that "the sovereign is exempt from the consequences of laches").

### 2. *Defendant's Position*

Defendant alleges at least four factual predicates for a valid and appropriate use of the affirmative defense of estoppel. First, Defendant asserts that, the Government is estopped from seeking recovery of damages under the FCA for the loss of high-value end items and for the repudiation its express contractual promise to assume that loss. *See United States v. United States Cartridge Co.*, 198 F.2d 456, 464–65 (8th Cir.1952) (holding that the government was barred from bringing FCA action because it agreed to limit the contractor's liability for damages under fraud).

---

**30.** The Court notes that in our November 2, 1999 Order, we dismissed Defendant's Third Affirmative Defense, the HVIC, in relation to Plaintiffs' FCA claims only (*see* doc. 554). This Court has not made a ruling as to the viability of the HVIC as a defense to Plaintiff's common-law fraud and contract claims. The Court believes that Defendant, as well as Plaintiffs, should be given the widest latitude and the greatest opportunity to present their side of the facts and issues in this action, as well as defend any claims leveled against it at a trial on the merits.

Second, Defendant avers that, the Government is estopped from claiming FCA damages based on the 1991 and 1993 re-inspections because the Army was an integral and decisive part of the parameters of the re-inspections. *See Hughes Helicopters,* 71 F.3d at 327 (holding that the Army's approval of and participation in particular procedures precludes the government from proving the requisite intent for an FCA violation). Third, Defendant asserts that, because the Government has already recovered adequate contractual remedies under the warranty provisions of the prime contracts, the Government is now estopped from pursuing remedies for an alleged breach of contract. *See Transamerica Delaval,* 476 U.S. at 872, 106 S.Ct. 2295 (finding that a party may either pursue warranty claims or sue for breach of contract; but could not do both). Fourth, Defendant submits that, because the Government has accepted and retained full use of the helicopters at issue, the Government is estopped from now attempting to revoke acceptance, a prerequisite for its breach of contract claim. *See Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.,* 72 F.3d 190, 201 (1st Cir.1995) (holding that a party may not revoke acceptance a year and a half after learning of potential defects).

In regards to it Fourth Affirmative Defense, Defendant counters that, there is no absolute prohibition on asserting laches against the Government. *See United States v. Hardage,* 116 F.R.D. 460, 467 (W.D.Okla.1987) (refusing to strike the defense of laches from being asserted against the government). Moreover, Defendant contends that, the doctrine of laches is a bar to Plaintiffs' breach of contract claims. Specifically, Defendant asserts that, the doctrine of laches "is an equitable principle that bars recovery in circumstances in which a plaintiff's delay in seeking a judicial remedy prejudices a defendant", which Defendant claims is what actually happened in this case. *Bylinski v. City of Allen Park,* 169 F.3d 1001, 1003 (6th Cir. 1999). Therefore, Defendant moves this Court to deny Plaintiffs' Motion as to its Eighth Affirmative Defense.

On July 19, 1999, Plaintiffs filed its Reply brief in which Plaintiffs counter that Defendant's legal theories defending this Motion are either without merit, without legal relevance, or are without sufficient evidence to prevent this Court from granting their Partial Motion for Summary Judgment (*see* doc. 492). In addition, Plaintiffs re-argue many of the points they asserted in their original Motion (doc. 459). For the sake of brevity and not wanting to re-review all of Plaintiffs' arguments that were asserted in its Reply brief, the Court will take Plaintiffs' Reply into our consideration on this matter, but will not repeat those arguments here.

### C. *Plaintiffs' Motion for Partial Summary Judgment is Denied*

To survive a motion for summary judgment, Defendant must establish evidence on which a reasonable jury could find for Defendant. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. A reviewing court must view the evidence in a light that is most favorable to the non-moving party. *See Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548. Having reviewed the affidavits, deposition testimony, briefs, exhibits, and all other materials furnished in support and in opposition to Plaintiffs' Motion for Partial Summary Judgment (doc. 459), and after hearing the Parties arguments and representations of counsel at the August 12th hearing, the Court hereby DECLARES that there are genuine issues of material facts as to the claims set forth above. Consequently, the Court must DENY Plaintiffs' Motion for Partial Summary Judgment (doc. 459).

### CONCLUSION

For the foregoing reasons, the Court finds that: (1) Defendant's Motion for Summary Judgment (doc. 456) is hereby DENIED; (2) Plaintiffs' Motion for Partial Summary Judgment in Regards to the Liability as to Helicopters Sold With Defective Gears (doc. 457) is hereby DE-

NIED; (3) Plaintiffs' Motion for Partial Summary Judgment in Regards to Defendant's Third Affirmative Defense in relation to the HVIC and the FCA (doc. 458) is hereby GRANTED–IN–PART (*see* doc. 554), and is hereby DENIED–IN–PART in relation to the issue of the presence and applicability of Defendant's liability insurance coverage; and (4) Plaintiffs' Motion for Partial Summary Judgment in Regards to Defendant's Fourth, Eighth, and Twelfth Affirmative Defenses (doc. 459) is hereby DENIED. The Court finds that genuine issues of material fact exists as to all of the above motion for summary judgment that prevent this Court from finding as a matter of law that either Party prevails on the issues now before us.[31] In addition, the Court notes that this action is set for summary jury trial according to the Court's February 3, 2000 Order (*see* doc. 593).

SO ORDERED.

---

**31.** The Court would like to take this opportunity to list what we found to be some of the more notable, but certainly not exclusive, genuine issues of material fact in order to give the Parties sufficient notice in order to properly prepare for their Joint Final Pretrial Order and the Court's February 3, 2000 Scheduling Order (*see* doc. 593):

(1) Plaintiffs' FCA claim that certain gears that were manufactured by Speco and delivered to the Government by Defendant, allegedly contained microscopic grinding cracks in the dampening ring grooves;

(2) Plaintiffs' FCA claim that the 1991 Saudi Arabia and 1993 Ft. Meade incidents were caused by defective gears that were supplied to the Government by Defendant, resulting in the destruction of one helicopter and serious damage to the other;

(3) Plaintiffs' FCA claim that alleges there was improper or insufficient 1991 and 1993 re-inspections of the gears in question, as well as faulty destructive gear testing;

(4) Plaintiff's FCA claim asserting that Defendant possessed the necessary element of intent (i.e.,recklessness, deliberate indifference, etc.) while allegedly violating the FCA due to the supplying defective gears and helicopters to the Government;

(5) Defendant's allegations of a scientific dispute over "rejectable CICN", as well as the "nital etch" testing;

(6) The remaining factual issues of whether the essential elements supporting Plaintiffs' alternate theories of liability (i.e., fraud, breach of contract, unjust enrichment, and payment by mistake) can be proven, and whether Defendant's Affirmative Defenses (i.e., estoppel, laches, etc.) acts as a bar to those alternate claims;

(7) The issue of the HVIC and whether Defendant's remaining Affirmative Defenses acts as a bar to Plaintiffs' common law fraud and contract claims; and

(8) The issue of whether Plaintiffs' alleged damages, that are asserted under an FCA theory of recovery, can be proven at trial to be one of a direct or consequential or direct nature. If the damages are found to be consequential, then Plaintiffs' damages claims would likely be denied any recovery under an FCA theory of liability. However, if Plaintiffs' damages are found to be direct in nature, then those damages may be recoverable under an FCA theory of liability. The issue of damages will be further addressed at trial. (*see* docs. 456, 484 & 491; *see also* docs. 554 & 579).